**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
WOLFE FINANCIAL INC., et al.,   )
                                )
          Plaintiffs and        )
          Counter-Defendants,   )
                                )
               v.               )        1:17cv896
                                )
JOHN RODGERS, et al.,           )
                                )
          Defendants and        )
          Counter-Claimants.    )
```

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommended ruling on Matthew Mathosian's Motion for Temporary Restraining Order and Preliminary Injunction ("Preliminary Injunction Motion") (Docket Entry 35). (See Docket Entry dated Feb. 8, 2018; see also Docket Entry 44 (withdrawing request for temporary restraining order).)[1] For the reasons that follow, the Court should deny the Preliminary Injunction Motion.

## I. BACKGROUND

### A. The Pleadings

On October 5, 2017, Mathosian, along with Wolfe Financial Inc. (d/b/a Integrity Mortgage Group) ("Integrity") and Marian

---

[1] A magistrate judge may not "determine . . . a motion for injunctive relief," 28 U.S.C. § 636(b)(1)(A), but may "conduct hearings, including evidentiary hearings, and [may] submit . . . recommendations for the disposition, by a [district] judge of the court, of any [such] motion," 28 U.S.C. § 636(b)(1)(B).

Siemering, commenced this action.  (See Docket Entry 1.)  They filed their First Amended Complaint ("FAC") five days later.  (See Docket Entry 4.)  It asserts nine causes of action against various configurations of nine individuals and entities, including John Rodgers and Prime Mortgage Lending, Inc. ("Prime").  (See id. at 2-3, 7-14.)  As concerns the Preliminary Injunction Motion, the FAC alleges, as "Count VIII," that Rodgers committed "Libel/Slander Per Se" against Mathosian.  (Id. at 12; see also id. at 15 (requesting, as relief from Rodgers, an injunction prohibiting "any further libel or slander of Mathosian," as well as "an award of punitive and compensatory damages due to [Rodgers's] libel and slander of Mathosian").)  Pertinent to that claim, the FAC states:

1) "Siemering and Mathosian previously worked for Rodgers at Prime, but left to move to Integrity" (id. at 6; see also id. at 3 ("Rodgers is . . . a 50% owner of Prime. . . .  Prime is a direct competitor to Integrity in the mortgage lending industry."));

2) "[s]ince [Siemering and Mathosian] left, Rodgers has . . . disparag[ed] them to potential employees . . . [and] accus[ed] them of telling lies about him" (id. at 6);

3) "Rodgers has also carried on a campaign of disparaging Mathosian and injuring his reputation and good will in the mortgage banking community" (id.; accord id. at 12; see also id. at 7 ("Rodgers has repeatedly emailed Mathosian's current employer, making disparaging comments about him."));

4) "Rodgers has made false and malicious statements attributing conduct and behavior to Mathosian that are contrary to customary and lawful mortgage banking business practices" (id. at 6; accord id. at 12; see also id. at 6-7 (giving as concrete examples of such "false statements": "repeatedly referr[ing] to Mathosian as a liar," "referr[ing] to Mathosian as lacking sales experience," "referr[ing] to Mathosian as being overpaid," and "call[ing] Mathosian a sociopath to industry colleagues"));

5) "Rodgers made and is making these false and malicious statements knowing they were false or with a reckless disregard for the truth, without reasonable grounds to believe they were true, and with intent to injury [sic] and defame Mathosian" (id. at 12);

6) "[t]he false and malicious statements have negatively impacted Mathosian's income and ability to hire, and have injured Mathosian's reputation and good will" (id.);

7) "[t]he false and malicious statements have caused parties to back out of deals with Mathosian, severely impacting his income" (id.; see also id. at 6 ("Mathosian make[s] a large portion of [his] income based on loan activity, and [is] paid a percentage of closed loans.")); and

8) "[a]s a direct result of Rodgers'[s] actions, Mathosian has been irreparably harmed and continues to be irreparably harmed, and

Rodgers'[s] actions have contributed to [Mathosian's] emotional distress" (id. at 12).[2]

Rodgers answered, denying in material part the foregoing allegations. (See Docket Entry 15 at 5, 9; see also id. at 10 ("The statements [Mathosian] claim[s] are defamatory are true.").)[3]

B.  The Preliminary Injunction Motion and Related Filings

On January 16, 2018, Mathosian filed the Preliminary Injunction Motion. (See Docket Entry 35.)  Pursuant thereto, he proposed that the Court enter this injunction:

> WHEREAS. Plaintiff Matthew Mathosian has moved for a preliminary injunction enjoining Defendant John Rodgers from libeling and slandering Mathosian, it is hereby ordered as follows:
>
> 1. Until this case is decided on the merits, Rodgers shall cease making any libelous or slanderous statement about [] Mathosian;
>
> 2. Until this case is decided on the merits, Rodgers shall cease making any derogatory statement about [] Mathosian;
>
> 3. Until this case is decided on the merits, Rodgers shall cease making any untrue statement about [] Mathosian.

(Docket Entry 35-1 at 1 (emphasis added).)

---

[2] Integrity, Siemering, and Mathosian have moved for leave to file a second amended complaint (see Docket Entry 32), but their proposed new pleading does not alter (or expand upon) the above-quoted allegations (see Docket Entry 32-1 at 7-8, 14).

[3] In addition, Prime countersued Mathosian and Integrity, including for defamation. (See Docket Entry 15 at 11-32.)

Beyond the allegations of the FAC (quoted in Subsection I.A.), the Preliminary Injunction Motion relies for factual support on:

1) the assertion that, "on December 14, 2017, well after [Mathosian, Siemering, and Integrity] filed this lawsuit, Rodgers sent a libelous email to a member of the mortgage lending industry that Integrity was in the process of hiring and has since hired, named Adam Cohn" (Docket Entry 35 at 2 (citing id. at 9-13));[4] and

2) the "certifi[cation] that [Mathosian's attorneys] ha[d] given written notice to [] Rodger's [sic] counsel that [sic] of their intent to file [the Preliminary Injunction Motion], and sought, to no avail, to have [] Rodgers agree to stop making any further statements" (id.).

Rodgers responded in opposition to the Preliminary Injunction Motion (see Docket Entry 38) and submitted therewith an affidavit

---

[4] That e-mail from Rodgers to Cohn, which bears the "Subject: It's all public now," states:

> Maybe you should get Thomas to come to work for you in N.C. I would let him come back. Our response has been in the public domain since Monday. If you care to even read it, DKT 015 is the best reading from page 17-32. Especially the part about Mathosian misrepresenting his Incentive pay. Crimes of moral turpitude and embezzlement don't normally sit well with state banking commissions, investors or warehouse banks. Furthermore, suing one of your former branches for nothing should also be noted especially after you steal 150k of their earned income.

(Docket Entry 35 at 10 (referencing Docket Entry 15 at 17-32); see also id. at 10-11 (embedding link to Docket and reproducing four paragraphs of counterclaim by Prime (Docket Entry 15 at 30-31)).)

from one of his attorneys, Matthew P. McGuire, authenticating attached correspondence from the period of January 12-16, 2018, between McGuire and Thomas G. Pasternak (one of Mathosian's attorneys), some of which reflected copying to Edward B. Cole (Mathosian's other attorney) (see Docket Entries 38-2, 38-3, 38-4). That affidavit and related correspondence show as follows:

1) near mid-day,[5] Friday, January 12, 2018, Pasternak e-mailed McGuire, (A) reporting that Mathosian (through Pasternak and Cole) "plann[ed] on bringing a TRO/PI motion against [] Rodgers to stop him from making further defamatory statements about [] Mathosian" and (B) asking "if [Rodgers] will agree to stop doing so, so that [they] don't have to bring the motion" (Docket Entry 38-3 at 3);

2) within minutes, McGuire replied (copying Cole), soliciting "a concrete example" (id.);

3) Pasternak promptly answered by transmitting part of the e-mail from Rodgers to Cohn (dated December 14, 2017) which Mathosian later appended to his Preliminary Injunction Motion (see id.; see also Docket Entry 35 at 10);

4) shortly, McGuire rejoined (again copying Cole) that the example offered by Pasternak contained "nothing defamatory," but

_____

[5] As noted at the evidentiary hearing on the Preliminary Injunction Motion, at the time of this exchange, "Pasternak was operating out of Chicago. [] McGuire was operating out of North Carolina, so the time [listed in the e-mail chain] bounces back and forth . . . between Central and Eastern." (Docket Entry 56 at 6.)

nonetheless committed to "speak with [Rodgers] about refraining from any further commentary" (Docket Entry 38-3 at 2);

5) Pasternak "disagree[d with McGuire's assessment of the e-mail] and [requested] an answer [about an agreement to cease making defamatory statements] by COB Monday[, January 15, 2018]" (id.);

6) on that Monday (a federal holiday honoring Dr. Martin Luther King, Jr.), McGuire e-mailed Pasternak that McGuire was "out sick with the flu but w[ould] provide a response tomorrow" (id.);

7) Pasternak responded: "[s]onics [sic] good" (id.);

8) as promised, on Tuesday, January 16, 2018, McGuire e-mailed Pasternak a letter "writ[ten] on behalf of [McGuire's] clients in response to [Pasternak's] December 19, 2017 letter to [one of McGuire's] associate[s about other matters], as well as in response to [Pasternak's] January 12 emails concerning allegedly defamatory comments made by [] Rodgers" (Docket Entry 38-4 at 2; see also Docket Entry 38-2 at 3 ("The following day, January 16, 2018, at 2:39 pm ET, I sent Mr. Pasternak a letter via email that addressed a number of outstanding issues in the case, including his concerns about allegedly defamatory comments being made by Mr. Rodgers."));

9) in that letter, McGuire (A) expressed his view that "the easier problem to solve is a mutual agreement to refrain from any negative comments about the other side," (B) confirmed that he "ha[d] spoken with [his] clients, and they are willing to abide by such an agreement if [Pasternak's] clients are as well," and (C)

reiterated that McGuire's "clients will agree to . . . [a m]utual non-disparagement agreement" (Docket Entry 38-4 at 2-3; <u>see also</u> Docket Entry 38-2 at 4 ("I have redacted portions of this copy [of the letter provided to the Court] because they contain communications that could be deemed inadmissible pursuant to Rule 408 of the Federal Rules of Evidence. Should the Court wish, I would be glad to provide an unredacted copy of the letter.")); and

10) McGuire "did not receive any response to the January 16 letter prior to [] Mathosian's filing of his [Preliminary Injunction] Motion" (Docket Entry 38-2 at 4; <u>see also</u> Notice of Electronic Filing, Docket Entry 35 (documenting filing of Preliminary Injunction Motion "on 1/16/2018 at 5:44 PM EST")).

Based on that sequence of events, in opposing the Preliminary Injunction Motion, Rodgers (through McGuire) explicitly accused Mathosian and his attorneys of exhibiting a "lack of candor to the Court in seeking [such] extraordinary relief." (Docket Entry 38 at 2.) Specifically, Rodgers's Response argued: "Mathosian claims he unsuccessfully attempted to obtain Rodgers'[s] agreement to stop making disparaging comments. To the contrary, counsel for Rodgers expressly informed Mathosian's counsel of Rodgers'[s] willingness to enter a mutual non-disparagement agreement just hours before Mathosian filed the instant Motion." (<u>Id.</u>)

Mathosian thereafter replied. (<u>See</u> Docket Entry 45; <u>see also</u> Docket Entry 44 at 1 ("withdraw[ing]" request for "temporary

restraining order").)  In that Reply, Mathosian contested neither the Response's account of the communications between McGuire and Pasternak (summarized above) nor the Response's accusation that Mathosian's attorneys had fallen short of their duty of candor regarding their efforts to secure voluntary cessation of defamatory commentary; instead, Mathosian's Reply countered:  "To the extent Rodgers's arguments rely upon his counsel's statement that he is willing to no longer engage in making defamatory statements regarding Mathosian, such arguments are belied by the fact that Rodgers made such statements in text messages and emails after he was sued for making those very statements."  (Docket Entry 45 at 3 (citing Declaration of Matthew Mathosian (Docket Entry 45-1), which, in turn, does not clearly describe any concrete, defamatory statement reportedly made by Rodgers after this action commenced).)

Additionally, as evidentiary support for the Preliminary Injunction Motion, Mathosian tendered (with his Reply) a Declaration (purportedly made "under penalty of perjury," but without certification of its contents as "true and correct," as provided by 28 U.S.C. § 1746 (see Docket Entry 45-1 at 1)):

1) repeating the generalized allegations (previously presented in the FAC, as detailed in Subsection I.A.) that "Rodgers has made false and malicious statements attributing conduct and behavior to [Mathosian] that are contrary to customary and lawful mortgage banking business practices" (id. at 2), that Rodgers "repeatedly

e[-]mail[ed Mathosian's] current employer with disparaging comments" (id.), and that "Rodgers'[s] actions have caused [Mathosian] substantial harm in lost wages" (id.), as well as the somewhat-more-particularized allegations that "[c]ertain branches and employees that had committed to joining Integrity changed their mind [sic] after hearing Rodger's [sic] statements" (id.), and that "Rodger's [sic] false statements included . . . repeatedly calling [Mathosian] a liar, claiming that [Mathosian] lack[s] sales experience, claiming that [Mathosian is] overpaid, [and] calling [Mathosian] a sociopath to industry colleagues" (id.); and

2) attaching, as "specific examples of Rodger's [sic] statements[,] . . . an e[-]mail to the Prime staff after Mathosian resigned[ in which] Rodgers implied that Mathosian was overpaid and not a good salesman . . . [, as well as an e-mail] Rodgers sent [] Siemering . . . implying that Mathosian was a sociopath" (id. (citing id. at 5-7 (undated e-mail from Rodgers to Prime staff), 9-13 (e-mail dated December 27, 2016, from Rodgers to Siemering))).[6]

---

[6] Mathosian's Declaration also references and appends "a text [message] from Rodgers to Siemering on Christmas Eve, 2016, . . . stat[ing Rodgers's] intention to torpedo Integrity . . . [and] a text message to [] Cohn, . . . stat[ing] that Cohn could 'sail off into the sunset' if he went to work anywhere but Integrity and listing other mortgage companies who are direct competitors of Prime." (Docket Entry 45-1 at 2 (citing id. at 15 (text message to Siemering), 17-19 (text message to Cohn).) Mathosian's Reply, however, does not explain how those statements relate to his Libel/Slander Per Se claim or the Preliminary Injunction Motion. (See Docket Entry 45 at 1-7.)

Because Mathosian submitted his Declaration with his Reply (rather than with his Preliminary Injunction Motion), the Court (per the undersigned United States Magistrate Judge) granted Rodgers's Unopposed Motion for Leave to File a Surreply. (See First Text Order dated Feb. 9, 2018 (granting Docket Entry 47).) Rodgers then filed his Surreply. (See Docket Entry 49.)

### C. The Evidentiary Hearing

The undersigned Magistrate Judge set an evidentiary hearing on the Preliminary Injunction Motion. (See Second Text Order dated Feb. 9, 2018.) The order doing so mandated that, "on or before 02/13/2018, the parties (through counsel) shall exchange by e-mail . . . copies of any documents the party may seek to introduce at the hearing." (Id.; see also Text Order dated Feb. 13, 2018 (granting Mathosian's Motion for a Continuance of Preliminary Injunction Hearing (Docket Entry 50) and re-setting the hearing, but providing that "[a]ll of the requirements established in the prior Text Order setting the original hearing date remain in force").) Ultimately, the hearing took place, with Mathosian testifying as the only witness and offering documentary evidence (resulting in the admission of some exhibits and the deferral of admission decisions as to others), as well as counsel for each side addressing their efforts to reach a non-disparagement agreement before Mathosian filed the Preliminary Injunction Motion. (See Docket Entries 53, 56.) The hearing concluded with argument from

counsel on the merits of the Preliminary Injunction Motion (see Docket Entry 56 at 82-96), after which the undersigned Magistrate Judge "t[ook] th[e] matter under advisement" (id. at 96; see also id. ("I'll enter a written recommendation that will be for the review of a district judge for final determination.")).

i. Mathosian's Testimony

Mathosian began his testimony with some background information about himself and his move from Prime to Integrity. (See id. at 27-35.) He then identified (as Exhibit 7) the e-mail Rodgers sent to Prime staff upon Mathosian's departure (one of the e-mails Mathosian submitted with his Declaration (Docket Entry 45-1 at 5-7)). (See Docket Entry 56 at 36.)[7] After agreeing with his attorney (Pasternak) that "Rodgers in this e-mail to his staff sa[id] things about [Mathosian]," Mathosian struggled to "point those [things] out," whereupon Pasternak prompted Mathosian to look for comments "about [him] being not a good sales manager." (Docket Entry 56 at 36-37.) Mathosian then responded: "[Rodgers] said . . . [Mathosian] lacked the ability to diffuse situations with borrowers and realtor partners[ and] . . . had zero originating, underwriting or processing experience, which caused issues for people." (Id. at 37.) Apparently dissatisfied with that response, Pasternak re-directed Mathosian to a different part of the e-mail,

_____

[7] Exhibit 7 was admitted without objection from Rodgers. (Docket Entry 56 at 37.)

which said Rodgers "would hire a true sales manager that would help [Prime] grow." (Id.)  Despite Pasternak's prodding, Mathosian could not locate "anything else in this . . . e-mail that [he] think[s] malign[ed him]." (Id.)[8]

Next, Mathosian reviewed Exhibit 1, which he described as "an e-mail [incorporating an internet article] that [Rodgers] sent to [Siemering] basically advising her she should not be associating with [Mathosian] because [Rodgers] believed that [Mathosian] was a sociopath and . . . highlight[ing] certain qualities . . . that [Rodgers] felt that [Mathosian] exhibited." (Id. at 38; see also Docket Entry 45-1 at 9-13 (appending same e-mail to Mathosian's Declaration);[9] Docket Entry 56 at 39 (admitting Exhibit 1 without objection from Rodgers), 58 ("Q. Do you know if Mr. Rodgers sent

_____

[8] On cross-examination, Mathosian conceded: (1) while at Prime, he served as the "CEO," performing many non-sales-related duties, and did not function as "a true sales manager" (Docket Entry 56 at 56-57); and (2) "when [he worked] at Chase [Bank for 16 years before moving to Prime] and even after [he] came to Prime, [he] w[as] not a loan originator, underwriter or processor" (id. at 57-58; see also id. at 28-31 (reviewing Mathosian's job history, during which he performed a year or less of "operational-type work, such as closing loans and some processing")).

[9] The copy of the above-referenced e-mail that Mathosian submitted with his Declaration does not reflect any highlighting within the incorporated article. (See Docket Entry 45-1 at 9-12.) Exhibit 1 similarly lacks any such highlighting, although a separate copy of the e-mail that Pasternak handed up to the Clerk with Exhibit 1 did contain highlighting for some words and phrases within the article. Because Mathosian did not offer any testimony (or other evidence) to authenticate the latter document or its highlighting, the Court need not address that material.

[Exhibit 1] to anyone else [other than Ms. Siemering]?  A. No."),
61-62 ("Q. [After receiving Exhibit 1], in fact, [Ms. Siemering]
did leave [Prime] and went to work with you at Integrity, didn't
she?  A. She did.  Q. And you still work with [her], correct?  A.
I do.  Q. Did [Exhibit 1] impact your work relationship with [her]
in any way?  A. Ultimately, no. . . .  Q. Okay.  So other than
[you] perhaps being offended, there were no adverse consequences
from Mr. Rodgers sending [Exhibit 1] to Ms. Siemering, were there?
A. I would say other than that, no, nothing.").)

Mathosian then discussed Exhibit 2, a "text [message] that []
Rodgers sent to [Siemering]" (Docket Entry 56 at 39), which
Mathosian took "issue" with "first and foremost" not due to any
alleged defamatory content, but instead because it conveyed
Rodgers's "intention . . . to start torpedoing [Integrity]" and "to
offer his services to put [Siemering] with other firms" (id. at 39-
40; see also Docket Entry 45-1 at 2 (referencing, in Mathosian's
Declaration, same "torpedoing" language), 15 (attaching same text
message as appears in Exhibit 2)).  Beyond that concern, Mathosian
merely noted that, in Exhibit 2, Rodgers "said that [Mathosian] was
lying . . . which was not true."  (Docket Entry 56 at 40.)[10]

_____

[10] Rodgers objected to Mathosian's testimony "speculating about
what [] Rodgers was thinking [when he sent Exhibit 2]" (Docket
Entry 56 at 40), but did not otherwise object to the admission of
Exhibit 2 (see id. at 41).  It was admitted.  (Id.)

At that point, Mathosian "turn[ed] to Exhibits 3, 4, and 5" (id. at 41), which he identified as "a text [message] string from [] Rodgers to [] Cohn" (id.). Mathosian testified that his "impression [of the string] was that [] Rodgers was both [sic] threatening [Cohn] that if [Cohn] came to work with [Mathosian] that [Cohn] would be wrapped up in litigation. [Rodgers] also told [Cohn] that there would be better options and better places to work than to come and work with [Mathosian]." (Id. at 43-44.)[11]

Mathosian also testified that "Exhibit 6 was an e-mail that [] Rodgers sent to [] Cohn. . . . [It] accus[es Mathosian] of misrepresenting [his] incentive bonus . . . [to] st[eal] $14,000 and then it goes on to say that . . . crimes of moral turpitude and embezzlement don't normally sit well with state banking commissioners, investors, and warehouse banks." (Id. at 44-45; see also Docket Entry 35 at 9-13 (including same e-mail, dated December

_____

[11] According to Rodgers, Mathosian did not "establish[] a proper foundation for [Exhibits 3, 4, and 5]. This is hearsay upon hearsay." (Docket Entry 56 at 44; see also id. at 66-69 (describing Exhibits 3, 4, and 5 as photographs (forwarded to Mathosian by Cohn) taken by Cohn, his wife, or someone else, of text messages appearing on the screen of Cohn's cellular telephone, and acknowledging that none of the messages purportedly from Rodgers mention Mathosian).) The undersigned Magistrate Judge took that objection "under advisement." (Id.) Substantial questions exist about the admissibility of Exhibits 3, 4, and 5; however, because they do not contain any libelous per se statement(s), their admission would not prejudice Rodgers. As a result, for present purposes, this Recommendation deems Exhibits 3, 4, and 5 admitted.

14, 2017, with Preliminary Injunction Motion).)[12]  On cross-examination, Mathosian conceded that the "allegation that [he stole from Prime by misrepresenting his incentive pay] . . . [w]as made in [Prime's] counterclaims against Mathosian . . . ." (Docket Entry 56 at 74; see also id. at 75 (documenting Mathosian's agreement with statement in Exhibit 6 that "'[c]rimes of moral turpitude and embezzlement don't normally sit well with state banking commissions, investors or warehouse banks'").)

Lastly, Mathosian examined Exhibit 9, "a complaint to the State of Florida from [Ryan] Kerian [of Prime] that alleges that as a result of . . . this particular lawsuit [Integrity] had declined [Kenyetta Crosdale's] application for a mortgage and that [Integrity] . . . w[as] not treating her fairly and appropriately"

---

[12] During the evidentiary hearing, Rodgers argued that "[Exhibit 6] was actually stolen by [] Cohn from a [Prime] server. . . . [It] is essentially fruit of the poisonous tree. [It] was never authorized to be sent to [] Mathosian or anyone else outside of Prime; and for that reason . . . it should be stricken." (Docket Entry 56 at 45.)  The undersigned Magistrate Judge "t[ook] that [argument] under advisement" (id. at 46), but now overrules it, after independent research "identified no role for the fruit-of-the-poisonous[-]tree doctrine in the context of this civil action," O'Dell v. Kelly Servs., Inc., No. 15CV13511, 2017 WL 676945, at *10 (E.D. Mich. Feb. 21, 2017) (unpublished); see also Lineberger v. Yang, No. 5:14CV137, 2016 WL 5928816, at *6 (W.D.N.C. Oct. 11, 2016) (unpublished) ("[T]he 'fruit of the poisonous tree' doctrine does not apply in the civil setting . . . ."); Chadwell v. Brewer, 59 F. Supp. 3d 756, 765 n.6 (W.D. Va. 2014) ("[T]he 'fruit of the poisonous tree' is an exclusionary rule designed to deter Fourth Amendment violations by preventing the admission of evidence derived from illegal searches in criminal trials.  It is not applicable to this civil action." (internal citation omitted)).

(id. at 48; see also id. at 79 ("I don't believe Mr. Rodgers'[s]
name was mentioned in [Exhibit 9].")), and Exhibit 8, "a letter
from Ms. Crosdale that says that she did not, in fact, authorize
the complaint [set forth in Exhibit 9] and that she was, in fact,
very happy with [Integrity's] services" (id. at 48; see also id. at
78-79 (acknowledging that Exhibit 8's only reference to Mathosian
bestows "a compliment")).[13]

### ii. Representations of Counsel about Non-Disparagement Agreement

Along with taking Mathosian's testimony, the undersigned
Magistrate Judge engaged with Cole, Pasternak, and McGuire
concerning their discussions about a non-disparagement agreement
(as an alternative to litigating the Preliminary Injunction
Motion). (See id. at 4-22.) In that regard, Cole reported that:

---

[13] Rodgers objected to the admission of Exhibits 8 and 9
because they "were disclosed . . . in contravention to the Court's
February 9th order to disclose all of the [hearing] exhibits by
. . . [February] 13th . . . ." (Docket Entry 56 at 46.) Pasternak
acknowledged that he received Exhibits 8 and 9 "two days before
[that] deadline" (id. at 46-47), but explained that he did not
timely disclose them because "[s]ometimes things come in and you
don't get to them right away" (id. at 47). A decision as to
"[w]hat consideration the Court w[ould] give [Exhibits 8 and 9]
. . . reserve[d]." (Id.) Pasternak's admitted failure to comply
with the disclosure deadline would warrant exclusion of Exhibits 8
and 9 (particularly given his poor excuse for his non-compliance);
however, because Exhibits 8 and 9 do not contain a single statement
by Rodgers (let alone any libelous per se statement(s) by him), no
prejudice would accrue to Rodgers from their admission. This
Recommendation thus treats Exhibits 8 and 9 as admitted.

1) Cole "was not aware of [the letter McGuire e-mailed to Pasternak on January 16, 2018] until after the [Preliminary Injunction M]otion was filed" (id. at 8);

2) "[a]s soon as [Cole] saw the [R]esponse [to the Preliminary Injunction Motion and the attached, redacted copy of the letter], [Cole] e-mailed [] McGuire . . . and asked him for a complete unredacted version, which he sent" (id. at 8-9; see also id. at 9-10 ("[I]t's a serious allegation that we misrepresented something to the Court, which was why I immediately e-mailed Mr. McGuire and said, 'Please send me the complete letter.'"));

3) "after [becoming] aware of the letter and all of the e-mail communications," Cole still believed "that the representation that was made in [the Preliminary Injunction Motion that Mathosian's attorneys sought, to no avail, to have Rodgers agree to stop making defamatory statements] is accurate," because "the unredacted letter . . . makes clear that there was not an offer on the table [by Rodgers] for a mutual non-disparagement agreement standing alone" (id. at 9; see also id. at 9-10 ("[The Preliminary Injunction Motion] represented efforts to reach some mutual understanding had failed and . . . that still is true. . . . The redactions [in the copy of the letter filed with Rodgers's Response] are fairly material to the issue of whether [he] w[as] willing to enter into a mutual non-disparagement agreement. . . . [T]he complete letter . . . conditioned the non-disparagement agreement on many other

-18-

things . . . ."), 13 ("[A] mutual non-disparagement [agreement]
. . . was just not, in fact, at all what was proposed."));

4) in addition, Cole "spoke with [] McGuire and inquired
whether [Rodgers] would be willing to simply enter into a non-
disparagement agreement standing alone to resolve the issues raised
in th[e Preliminary Injunction M]otion, leaving the remainder of
damages and ultimate relief to be litigated, and . . . the essence
of the response was no" (id. at 10; see also id. at 13 ("I asked
. . . McGuire whether [Rodgers] would be willing to enter a mutual
non-disparagement [agreement] standing alone and the answer was no.
. . . [M]y understanding from speaking to [] McGuire was that
there was no proposal to enter into a mutual or unilateral non-
disparagement agreement.   That was never something that was
proposed or on the table.")); and

5) Cole's "understanding was that . . . the position taken [by
Rodgers] was that [his] statements weren't defamatory and that he
had every right to continue making them" (id. at 10-11).

When asked "why [Mathosian's R]eply doesn't address any of
that[ and] doesn't dispute anything that [] McGuire represented in
[Rodgers's R]esponse, but . . . instead simply says that the . . .
willingness [of Rodgers] to no longer engage in making defamatory
statements [is] irrelevant because [] Rodgers had made statements
after th[is action] was filed" (id. at 10), Cole answered:  "[I]t
was an oversight.  I think we probably should have addressed the

accusation that we had misrepresented something to the Court and I'll acknowledge that we didn't do that and that was an oversight." (Id. at 11.)[14] Cole further indicated that, rather than "argu[ing] in the [R]eply that it's irrelevant whether [Rodgers would sign a mutual non-disparagement agreement]" (id.), Mathosian should have argued in the Reply that McGuire's statement that Rodgers would sign a non-disparagement agreement is "belied by the terms of the letter [McGuire sent to Pasternak], the redacted portions, and [Cole's] conversation with [] McGuire after [Cole received the letter]" (id.; see also id. at 16 ("[I]t's not in the [R]eply, but what mattered to me was the fact that there was no proposal to enter into a mutual non-disparagement or any other sort of agreement to limit further communications by Rodgers. So the [R]eply itself should have said that and it didn't.")).

Pasternak, in turn, "agree[d] with everything [] Cole said, but [added that] the fact that [Rodgers] was proposing a mutual non-disparaging agreement was another reason [Mathosian] rejected it. [Mathosian] ha[d] not done anything that [] Rodgers ha[d] done and for [Rodgers] to propose a mutual agreement was not effective for [Mathosian]." (Id. at 12 (emphasis added); see also id. at 13 ("THE COURT: So, [Mr. Cole] . . . you didn't share Mr. Pasternak's

14 The undersigned Magistrate Judge directed this inquiry to Cole in the first instance, because he signed the Reply (on his own and Pasternak's behalf) (see Docket Entry 45 at 7).

objection to [a] mutual[ non-disparagement agreement]. MR. COLE: Mr. Pasternak and I didn't discuss that specific issue . . . .").) Because, once more, the Reply said nothing about such matters, the undersigned Magistrate Judge asked Pasternak whether it "would have been more consistent with [his] duty of candor to have explained that [context] rather than saying that [he and Cole] sought, to no avail, to get [Rodgers to agree to stop making defamatory statements] without providing that context?" (Id. at 12-13.) Pasternak replied: "In hindsight, yes, Your Honor." (Id. at 13.)

Along similar lines, the undersigned Magistrate Judge inquired why Pasternak did not "pick up the phone and call [] McGuire and say what [Pasternak's and/or Mathosian's] problem was with the [proposal in the] letter [McGuire] sent to [Pasternak] as it related to the non-disparagement agreement instead of filing th[e Preliminary Injunction M]otion?" (Id. at 19.) Pasternak answered: "I assumed by [McGuire's] e-mail and his letter that we were done negotiating. That was his proposal that was on the table and we weren't comfortable with it." (Id. at 19-20.)

Cole's subsequent remarks, however, called into question whether Pasternak (and Mathosian) actually considered the proposal in McGuire's letter before Mathosian (through Cole, acting on his own and Pasternak's behalf (see Docket Entry 35 at 7)) filed the Preliminary Injunction Motion; specifically, Cole asserted:

> Pasternak was not in the office on [January] 16th.  I was
> finalizing th[e Preliminary Injunction M]otion to file.
> . . . I did not receive the letter [e-mailed by McGuire]
> on [January] 16th. . . .  I don't think there was an
> opportunity  . . . for either of us to respond,
> [Pasternak] having not been in the office and me not
> having been provided a copy of the letter.

(Docket Entry 56 at 20.)

For his part, McGuire disagreed with Cole's characterization of both their discussions after the filing of the Preliminary Injunction Motion and the letter McGuire sent to Pasternak before the filing of the Preliminary Injunction Motion:

> Mr. Cole described a conversation that we had when I
> said, no, we would not agree to a standalone mutual non-
> disparagement agreement.  I don't have the same
> recollection of that conversation . . . .
>
> My recollection is that when that question may have been
> posed, what I said was, "Well, for us to even have that
> conversation, you need to withdraw the  . . .
> [P]reliminary [I]njunction [M]otion because it's going to
> force my client to expend substantial time and resources
> fighting that."
>
> . . . The letter that I sent [to Mr. Pasternak before the
> filing of the Preliminary Injunction Motion] was a
> response not only to Mr. Pasternak's e-mail about alleged
> defamatory statements [since the commencement of this
> action].  It was also in response to a letter from
> December [2017] that Mr. Pasternak had sent with a
> settlement proposal, so that's why there are redactions
> in that letter.  We were responding in toto to everything
> that was on the table proposed to us at that time and
> that included Mr. Pasternak's e-mail to me about [an]
> allegedly defamatory e-mail sent [by Mr. Rodgers to Mr.
> Cohn] a month or so prior. . . .  I stand by what I wrote
> in our [Response].
>
> . . . .

I don't agree with [Mr. Cole's] characterization [of my letter to Mr. Pasternak as conditioning assent to a mutual non-disparagement agreement on resolution of the entire case] and here's why. When I [first] responded to Mr. Pasternak . . . I said I would speak with my client about refraining from any further commentary. That was on January the 12th.

. . . .

So when I sent [Mr. Pasternak] the letter . . . [on January 16, 2018] . . . the first proposal in the letter [offered a mutual non-disparagement agreement], let's knock that off the table first, get that done, and then [the letter] had other proposals to resolve other facets of the case. At no point did anyone write back to me or e-mail and say "We'll agree to the mutual non-disparagement agreement, but we're going to have to resolve the other things later." So as a practical matter, once the [Preliminary Injunction M]otion was filed, . . . we proceeded to brief the matter and are here today.

But I think on January the 12th or 16th of 2018 if someone had come back to me and said, "Yes, we will agree to a mutual non-disparagement agreement," I feel comfortable representing to the Court that my client would have agreed to that independent of settlement of any of the other aspects of the case.

(Id. at 17-19.)

Because of the potential materiality of "the issue of whether or not there could have been an agreement to cease making [disparaging] statements . . . [to] the preliminary injunction factors" (id. at 21), as well as the "possib[ility] that a fuller understanding of the letter [McGuire sent to Pasternak before the filing of the Preliminary Injunction Motion] may be necessary for a full evaluation of th[ose] factor[s]" (id.), the undersigned Magistrate Judge directed counsel for Mathosian and Rodgers to

attempt to agree upon "a sufficiently unredacted form of the letter [that] would permit the Court to have what each side considers a full and fair understanding of what the letter said and what it didn't say" (id. at 22). The undersigned Magistrate Judge further ordered counsel to "file whatever [they] can agree to. . . . And if [they could not] agree . . . [they were required to] file a notice letting the Court know about that as well; and . . . [to] have that done by . . . March the 2nd." (Id.)

### D. Post-Hearing Filings

Mid-afternoon on March 2, 2018, Rodgers filed a Notice stating:

> On February 28, 2018, at approximately 5:45 p.m. ET, counsel for Rodgers notified counsel for Mathosian via email that Rodgers had no objection to submitting the entire unredacted letter to the Court, and asked counsel for Mathosian to let him know of their position on this issue. On March 2, 2018, at approximately 9:45 a.m. ET, counsel for Rodgers again asked counsel for Mathosian to let him know if they had any objection to submitting the entire unredacted letter. As of the time of the filing of this Notice, counsel for Mathosian has not responded to either email.

(Docket Entry 54 at 2 (emphasis added); see also Notice of Electronic Filing, Docket Entry 54 (documenting filing of Notice by Rodgers "on 3/2/2018 at 2:48 PM EST").)

After the close of business that day, Mathosian filed his own Notice (Docket Entry 55; see also Notice of Filing, Docket Entry 55 (documenting filing of Notice by Mathosian "on 3/2/2018 at 5:27 PM EST")), along with an unredacted copy of McGuire's letter to

Pasternak dated January 16, 2018 (Docket Entry 55-1). Mathosian's

Notice included the following "additional facts giving context to

the[] receipt and review of the letter" (Docket Entry 55 at 1):

> First, although the letter is dated January 16, 2018 and
> was, according to Mr. Matthew McGuire, e-mailed to Mr.
> Thomas Pasternak before the . . . Preliminary Injunction
> [Motion] . . . was filed, it was not reviewed by Mr.
> Pasternak until . . . January 17, 2018 . . . because (a)
> Mr. Pasternak was traveling for work at the time and (b)
> it was caught in Mr. Pasternak's spam folder.
>
> Second, Mr. Edward Cole called Mr. McGuire to inquire
> whether the [Preliminary Injunction] Motion could be
> resolved by entering into a mutual non-disparagement
> agreement alone[1] and was informed by Mr. McGuire that
> more was required.
>
> [1] [Mr. Mathosian] is willing to enter into a mutual
> non-disparagement agreement and believes that doing so
> would dispose of certain issues in this case, including
> the [Preliminary Injunction] Motion.

(Id. at 1-2.)[15]

> The entire body of the letter appears as follows:
>
> I write on behalf of my clients in response to your
> December 19, 2017 letter to my associate [], as well as
> in response to your January 12 emails concerning
> allegedly defamatory comments made by Mr. Rodgers.
> Suffice it to say that the parties have radically
> different views on what has transpired between December
> 2016 and today. I think the easier problem to solve is
> a mutual agreement to refrain from any negative comments
> about the other side, as well as an agreement not to
> engage in any inappropriate or illegal solicitation of
> the other parties' employees or branches. I have spoken
> with my clients, and they are willing to abide by such an
> agreement if your clients are as well. The far more
> difficult problem lies in a proper reconciliation of the

---

[15] Cole signed the Notice on his own and Pasternak's behalf.
(Docket Entry 55 at 2.)

harm that your clients generally, and Mr. Mathosian in particular, have inflicted on my clients.

The essence of Integrity's claims in this case is that a number of loan files were misappropriated when the Sparks made the move to Prime. Based on our research, we believe you have grossly overstated the potential damages attributable to these claims, but nevertheless Prime is willing to conduct a fair reconciliation of the files you contend were misappropriated against files that we believe were misappropriated recently by Mr. Cohn, following Mr. Mathosian's illegal solicitation of him. Assuming both sides approach this exercise with a sincere desire to set the record straight, this should not be an insurmountable hurdle.

Your clients' claims for defamation are, frankly, spurious. Hurt feelings are not actionable, and to date you have not articulated, much less alleged, any facts that show that one or two random comments or texts from Mr. Rodgers have harmed your clients in any way. By contrast, Mr. Mathosian's calculated misinformation campaign that he began conducting immediately upon resigning from Prime has caused my clients over $130,000 in damages attributable to salary increases and retention bonuses paid in an attempt to retain Prime employees to whom Mr. Mathosian lied. Such actions constitute an unfair and deceptive trade practice entitling Prime to recover treble damages and attorneys' fees. Similarly, Mr. Mathosian's conduct between the time he accepted a job with Integrity and the date he resigned from Prime is a per se breach of his fiduciary duty as an officer of Prime, which as a matter of law is an unfair and deceptive trade practice under North Carolina law.

Though we have not yet raised this issue as part of the Counterclaims, Integrity owed Darrell Sparks approximately $160,000 of earned income at the time he resigned from Integrity. Once the jurisdictional issue has been resolved, Mr. Sparks intends to pursue a claim for recovery of these unlawfully withheld funds in the appropriate forum.

Accordingly, my clients will agree to the following in an effort to resolve this case at this time:

1. Mutual non-disparagement agreement;

2. Mutual agreement to conduct solicitation of employees and branches in the ordinary course of business and with no factual misrepresentations regarding the other side;

3. A reconciliation of all loan files involved in the Sparks' [sic] move to Prime and Mr. Cohn's move to Integrity, with the goal of reimbursing the appropriate party which owned the right to close a particular loan;

4. Payment of $300,000 to Prime in consideration for damages caused by Mr. Mathosian's breach of his fiduciary duties prior to his resignation in December 2016 and his post-resignation conduct;

5. Payment of $160,000 to Mr. Sparks for return of the funds in his P&L account at Integrity when he was terminated in January 2017; and

6. Mutual dismissals and releases of all claims, counterclaims, and potential claims existing between the parties as of the date of any settlement.

Lastly, Prime has received several requests from former borrowers who have expressed a desire to close their respective loans with Integrity/Mr. Cohn, asking that Prime expressly release any claims it may have against Integrity, Mr. Cohn and Mr. Mathosian relating to that borrower's loan application. In at least one instance a borrower threatened to complain to the CFPB if Prime did not accede to her request. It is unseemly, to say the least, for your clients to put potential borrowers in the middle of an ongoing business dispute. Please direct your clients to cease this activity immediately.

Please contact me if you have any questions or wish to discuss this matter further.

(Docket Entry 55-1 at 1-2.)

## II. DISCUSSION

"A preliminary injunction is an extraordinary remedy . . . ." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). "A plaintiff seeking a preliminary injunction must demonstrate 'that

he is <u>likely to succeed on the merits</u>, that he is <u>likely to suffer irreparable harm</u> in the absence of preliminary relief, that the <u>balance of equities tips in his favor</u>, <u>and</u> that an <u>injunction is in the public interest</u>.'" <u>Id.</u> (emphasis added) (quoting <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008)).[16] "[E]ach preliminary injunction factor [must] be satisfied as articulated." <u>Pashby v. Delia</u>, 709 F.3d 307, 320 (4th Cir. 2013) (internal quotation marks omitted). Mathosian has fallen short on all four.

## A. Likelihood of Success on the Merits

Mathosian's FAC asserts that Rodgers committed "Libel/Slander Per Se" (Docket Entry 4 at 12), in contravention of North Carolina law (<u>see</u> Docket Entry 35 at 3-4 (arguing merits of said claim by reference to North Carolina law); <u>see also</u> Docket Entry 56 at 22-23 (documenting Mathosian's agreement (through Pasternak) and Rodgers's agreement (through McGuire) that "North Carolina substantive defamation law controlled")). According to the Supreme

---

[16] The Preliminary Injunction Motion concedes that the above-quoted standard applies (<u>see</u> Docket Entry 35 at 3 (quoting <u>Winter</u>, 555 U.S. at 20); <u>see also</u> <u>id.</u> at 1 (invoking Federal Rule of Civil Procedure 65 as basis for preliminary injunctive relief request), 2 (same)), notwithstanding the fact that the underlying claim arises under state law (<u>see</u> <u>id.</u> at 3-4 (arguing that North Carolina law supplies rules of decision for Libel/Slander Per Se claim)) and proceeds in federal court via supplemental jurisdiction (<u>see</u> Docket Entry 4 at 14 (citing 28 U.S.C. § 1367)). That concession accords with binding precedent. <u>See</u> <u>Capital Tool & Mfg. v. Maschinenfabrik Herkules</u>, 837 F.2d 171, 172-73 (4th Cir. 1988) (holding that federal preliminary injunction standard applies even in diversity jurisdiction cases where substantive state law controls).

Court of North Carolina, "'a publication is libelous [or slanderous] per se . . . if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to ridicule, contempt, or disgrace, or (4) it tends to impeach one in his trade or profession.'" Ellis v. Northern Star Co., 326 N.C. 219, 224 (1990) (quoting Flake v. News Co., 212 N.C. 780, 787 (1938)); see also Parker v. Edwards, 222 N.C. 75, 78 (1942) ("[A] defamatory statement, to be actionable, must be false." (internal quotation marks omitted)); Broadway v. Cope, 208 N.C. 85, 88 (1935) (explaining distinction between slander and libel as "one is oral and the other is written").[17]

_____

[17] Upon proof of libel or slander per se, North Carolina "law raises a prima facie presumption of malice and a conclusive presumption of legal injury and damage, entitling the victim of the defamation to recover damages, nominal at least, without specific proof of injury or damage." Badame v. Lampke, 242 N.C. 755, 756 (1955). For defamation outside the narrow confines of libel and slander per se, North Carolina law recognizes claims "per quod, and in such cases the injurious character of the words must be pleaded and proved, and in order to recover there must be allegation and proof of some special damage." Id. at 757; see also Stutts v. Duke Power Co., 47 N.C. App. 76, 82 (1980) ("[S]pecial damage means pecuniary loss, as distinguished from humiliation."). Given the express language of the FAC (see Docket Entry 4 at 12 (labeling "Count VIII – Libel/Slander Per Se")), "we are concerned here only with the law relative to libel [and slander] per se," Renwick v. News & Observer Publ'g Co., 310 N.C. 312, 317 (1984). Alternatively, Mathosian has not shown a likelihood of success on any per quod defamation claim because his hearing testimony failed to establish any special damage. (See Docket Entry 56 at 27-81.)

For a plaintiff to prevail on such a claim, "the words attributed to [the] defendant [must] be alleged substantially *in haec verba*, or with sufficient particularity to enable the court to determine whether the statement was defamatory." Stutts v. Duke Power Co., 47 N.C. App. 76, 84 (1980) (internal quotation marks omitted);[18] accord Jolly v. Academy Collection Serv., Inc., 400 F. Supp. 2d 851, 861 (M.D.N.C. 2005) (construing North Carolina law); see also Scott v. Statesville Plywood & Veneer Co., 240 N.C. 73, 75 (1954) ("The declaration or complaint ought to state the libel in the original language."). That requirement (applicable to all species of defamation claims in North Carolina) bears special significance where, as here, the plaintiff proceeds on a theory of "Libel/Slander Per Se," because, "[i]n determining whether publications are . . . libelous [or slanderous] per se . . . the [publication] alone must be construed, stripped of all insinuations, innuendo, colloquium and explanatory circumstances. The [publication] must be defamatory on its face within the four corners thereof." Renwick v. News & Observer Publ'g Co., 310 N.C. 312, 318 (1984) (emphasis added) (block quote formatting and internal quotation marks omitted).

In this case, the FAC sets out only four allegedly defamatory statements, i.e., that Rodgers:  (1) "repeatedly referred to

---

[18] *In haec verba* means "[i]n these same words; verbatim." *In haec verba*, Black's Law Dictionary (8th ed. 2004).

-30-

Mathosian as a liar" (Docket Entry 4 at 6); (2) "referred to Mathosian as lacking sales experience" (id. at 7); (3) "referred to Mathosian as being overpaid" (id.); and (4) "called Mathosian a sociopath" (id.).[19] Mathosian has not "ma[d]e a clear showing that he is likely to succeed at trial," Di Biase, 872 F.3d at 230, on his Libel/Slander Per Se claim as to any such statements.

As to the first of those four statements, Mathosian has come forward with precious little evidence tending to establish the

---

[19] As detailed in Subsection I.B. and Part I.C.i., in addition to the four above-quoted statements, Mathosian also attempted to ground his Preliminary Injunction Motion on statements in an e-mail Rodgers allegedly sent Cohn on December 14, 2017, highlighting Prime's theft-related counterclaim against Mathosian. (See Docket Entry 35 at 2, 4, 10; Docket Entry 45 at 2-3, 5-6; Docket Entry 56 at 44-45.) Given the FAC's filing date of October 10, 2017, the Libel/Slander Per Se claim therein cannot rest on that later-delivered e-mail; Mathosian therefore cannot show a likelihood of success on that claim by pointing to language in that e-mail. The Court thus need not resolve the question (impliedly disputed, but not adequately addressed, by Rodgers and Mathosian (compare Docket Entry 38 at 16, with Docket Entry 45 at 5)) of whether North Carolina law -- or Florida law, which arguably may apply to any libel claim based on that e-mail, in light of its apparent receipt by Cohn in Florida (see Docket Entry 56 at 26) -- would extend the absolute privilege against defamation liability for "statement[s] made in the due course of a judicial proceeding," Jarman v. Offutt, 239 N.C. 468, 472 (1954); see also DelMonico v. Traynor, 116 So. 3d 1205 (Fla. 2013) (discussing privileges applicable under Florida law to statements regarding judicial proceedings), to Rodgers's alleged, e-mailed repetition to Cohn of the exact words and/or the gist of the counterclaim, see, e.g., POET, LLC v. Nelson Eng'g, No. CIV 17-4029, 2018 WL 791254, at *4 (D.S.D. Feb. 7, 2018) (unpublished) (observing that "absolute privilege [for statements made in judicial proceedings] generally does not extend to [a litigant's] out-of-court communications with third parties [about the contents of pleadings]," but that "courts have recognized exceptions to this general rule . . . where the courts found that the non-parties had a substantial interest in the proceeding").

falsity of Rodgers's alleged generic reference to Mathosian "as a liar" (Docket Entry 4 at 6), a term defined as "a person who tells lies," www.Merriam-Webster.com/dictionary/liar (last visited Mar. 30, 2018). For example, Mathosian's Declaration simply labels the statement false, without elaborating about his truthfulness. (<u>See</u> Docket Entry 45-1 at 2.) Likewise, although Mathosian testified during the hearing that, <u>in Exhibit 2</u>, Rodgers "said that [Mathosian] <u>was lying</u> and attacking [Prime], <u>which was not true</u>" (Docket Entry 56 at 40 (emphasis added)), Mathosian's hearing testimony did not address the more general question (actually raised by the FAC) of whether Mathosian was (or was not) a liar (i.e., a person who tells lies) (<u>see id.</u> at 27-81). In any event, even if Mathosian had presented compelling evidence that Rodgers lied by describing Mathosian as a liar, North Carolina "[c]ourts have consistently held that alleged false statements calling [a] plaintiff dishonest or charging that [a] plaintiff was untruthful . . . are not actionable *per se*." <u>Gibson v. Mutual Life Ins. Co. of N.Y.</u>, 121 N.C. App. 284, 289 (1996) (internal ellipsis and quotation marks omitted) (deeming statement that the plaintiff "lied . . . and could not be trusted" as "not actionable *per se*" (internal quotation marks omitted)); <u>see also</u> <u>Johnson v. Bollinger</u>, 86 N.C. App. 1, 10 (1987) (ruling that statement "accus[ing the plaintiff-merchant] of being a 'liar'" did not constitute slander per se).

Nor does the record support a finding that Mathosian likely will succeed in securing a judgment for libel or slander per se based on the FAC's allegations that Rodgers "referred to Mathosian as lacking sales experience" (Docket Entry 4 at 7) and "as being overpaid" (id.). To the contrary, as revealed by Mathosian's own testimony reviewing the e-mail from Rodgers to Prime staff after Mathosian left Prime, on which Mathosian apparently relies for those sales- and compensation-related aspects of his defamation claim (see Docket Entry 56 at 36-37 (discussing Exhibit 7); see also Docket Entry 45-1 at 2 (characterizing same e-mail (attached as Exhibit A (id. at 5-7)) as "imply[ing] that Mathosian was overpaid and not a good salesman")):

1) said e-mail does not "refer[] to Mathosian as lacking sales experience" (Docket Entry 4 at 7), but instead states that Rodgers "would hire a true sales manager that would help [Prime] grow" (Docket Entry 56 at 37; accord Docket Entry 45-1 at 6);

2) Mathosian held the job of "CEO" at Prime, in which capacity he focused on many matters unrelated to sales, such that he did not act as "a true sales manager" (Docket Entry 56 at 56-57; see also Docket Entry 45-1 at 5 (setting out Rodgers's explanation that he would not "replac[e Mathosian with another CEO] and [instead personally would] tak[e] on the [duties of the CEO] position"));

3) said e-mail does not "refer[] to Mathosian as being overpaid" (Docket Entry 4 at 7); rather, it describes him as

"'highly compensated'" (Docket Entry 56 at 54; <u>accord</u> Docket Entry 45-1 at 5); and

4) Mathosian earned around $500,000/year at Prime, which he agreed made him "highly compensated" (Docket Entry 56 at 55).

The record thus indicates that the FAC misrepresents Rodgers's actual (e-mailed) words about Mathosian's sales experience and/or compensation status <u>and</u> that Mathosian acknowledged (under oath) the truthfulness of Rodgers's actual (e-mailed) words on those subjects.  Those circumstances portend a greater likelihood of dismissal for frivolousness than of a verdict of libel per se.

Finally, Mathosian has not "ma[d]e a clear showing that he is likely to succeed at trial," <u>Di Biase</u>, 872 F.3d at 230, on his Libel/Slander Per Se claim premised on the FAC's allegation that Rodgers "called Mathosian a sociopath" (Docket Entry 4 at 7).  In both his Declaration and hearing testimony, Mathosian attempted to support such a claim by citing an e-mail (with an embedded internet article) that Rodgers allegedly sent Siemering.  (<u>See</u> Docket Entry 45-1 at 2 (citing, as Exhibit B (<u>id.</u> at 9-13), e-mailed "article implying that Mathosian was a sociopath"); Docket Entry 56 at 38 (discussing same e-mail (identified as Exhibit 1)).)  To begin, as Mathosian has acknowledged, that e-mail does not "mention[ his] name," let alone "say [he] is a sociopath[.]"  (Docket Entry 56 at 60.)  To the extent Siemering would have understood the e-mail to concern Mathosian, the record does not establish that she viewed

(or any reasonable person in her position would have viewed) the e-mail (and its incorporated article entitled "Characteristics of a Sociopath" (Docket Entry 45-1 at 9)), "as stating actual facts about [Mathosian]," <u>Daniels v. Metro Magazine Holding Co., L.L.C.</u>, 179 N.C. App. 533, 539 (2006), <u>appeal dismissed and discretionary review denied</u>, 361 N.C. 692 (2007).

In that regard, the article in question begins by quoting the Sherlock Holmes character in a British television series describing himself as "'not a psychopath, [but instead] a high functioning sociopath,'" and then continues by examining "what the term sociopath entails, whether it is indeed distinct from psychopathy, and whether Holmes was right to diagnose himself as one." (Docket Entry 45-1 at 9.)  Given that backdrop, a reasonable reader in Siemering's position could conclude, at most, that any linkage (by Rodgers) of Mathosian to the term "sociopath" did not amount to a factual report that Mathosian met the official diagnostic criteria of a recognized mental impairment, but rather reflected only a layperson's (non-actionable) use of "'loose, figurative, or hyperbolic language,'" <u>Daniels</u>, 179 N.C. App. at 540.[20]  Put another

---

[20] Indeed, for decades, the reasonably informed have understood "that the word 'sociopath' is not generally accepted in the psychiatric community." <u>Harris v. Vasquez</u>, 949 F.2d 1497, 1517 (9th Cir. 1990); <u>see also</u> <u>id.</u> (crediting attorney for "kn[o]w[ing] that 'antisocial personality' was the term used in the [Diagnostic and Statistical Manual of Mental Disorders, the authoritative (continued...)

way, "any reasonable person reading [this e-mail] would recognize, based on the tenor, language, and context . . ., that the challenged statements constitute a subjective view, not a factual statement. When a speaker plainly expresses 'a subjective view, an interpretation, a theory, conjecture or surmise, rather than a claim to be in possession of objectively verifiable false facts, the statement is not actionable.'" Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 186 (4th Cir. 1998) (internal brackets omitted) (quoting Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993)); see also Crowe v. County of San Diego, 608 F.3d 406, 444-45 (9th Cir. 2010) (recognizing that, even where "statements regarding [an individual] 'exhibiting sociopathic tendencies'" come from a mental health professional and "may – or may not - be provably false, they do not constitute defamation per se").

In sum, Mathosian has not satisfied the likelihood-of-success-on-the-merits prong of the preliminary injunction test.

## B.  Likelihood of Suffering Irreparable Harm

Nearly 60 years ago, the United States Supreme Court "stated that 'the basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies' . . . ." Sampson v. Murray, 415 U.S. 61, 88 (1974) (internal

---

[20](...continued)
mental health reference compiled by the American Psychiatric Association]").

bracket omitted) (quoting <u>Beacon Theatres, Inc. v. Westover</u>, 359
U.S. 500, 506-07 (1959)).  "Yet the record [here] indicates that
[Mathosian gave no testimony on point when afforded the opportunity
to be] heard on the issue of irreparable injury . . . ."  <u>Id.</u>[21]
Further, to the extent Mathosian has "intimated that either loss of
earnings or damage to [his] reputation might afford a basis for a
finding of irreparable injury and provide a basis for [preliminary]
injunctive relief," <u>id.</u> at 89, the United States Supreme Court
"disagree[s]," <u>id.</u>  Accordingly, "[a]ssuming for the purpose of
discussion that [Mathosian] had made a satisfactory showing of loss
of income and had supported the claim that h[is] reputation would
be damaged as a result of [likely future defamatory statements],

---

[21] For example, although the FAC alleges that "false and
malicious statements [by Rodgers] have negatively impacted
Mathosian's income and ability to hire" (Docket Entry 4 at 12), and
"have caused parties to back out of deals with [him], severely
impacting his income" (<u>id.</u>), Mathosian's hearing testimony failed
to substantiate those allegations (<u>see</u> Docket Entry 56 at 27-81).
In fact, Mathosian has conceded that Siemering and Cohn, the only
two people Mathosian identified as hiring targets who received
communications allegedly defaming him, both subsequently came to
work for him.  (<u>See</u> Docket Entry 35 at 2; Docket Entry 56 at 61.)
Moreover, Mathosian testified that, since moving to Integrity, he
has continued to earn over half a million dollars annually.  (<u>See</u>
Docket Entry 56 at 49-51.)  Nor has Mathosian come forward with
sufficient evidence for the Court to conclude that Rodgers likely
will make defamatory statements during the pendency of this
litigation; as Rodgers has observed:  "[T]here is no imminent
threat.  The fact that [for proof of ongoing, post-FAC defamation
risk] Mathosian's [Preliminary Injunction] Motion rests on a lone
intra-company email sent over a month [before the filing of the
Preliminary Injunction Motion (i.e., Rodgers's e-mail to Cohn
regarding Prime's counterclaim)] demonstrates the absence of any
[likelihood of future irreparable] harm."  (Docket Entry 38 at 9.)

. . . th[at] showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a [preliminary] injunction . . . ." Id. at 91-92.

Simply put, "there is no [basis for a] finding by the [C]ourt that [Mathosian] would suffer irreparable damage or that []he has no adequate remedy at law in the event the [preliminary] injunction should be denied." Alberti v. Cruise, 383 F.2d 268, 272 (4th Cir. 1967). To the contrary, "[g]enerally an injunction will not issue to restrain torts, such as defamation" id., because "[t]here is usually an adequate remedy at law which may be pursued in seeking redress from . . . defamation," id. This case falls within that general rule/usual scenario, as the FAC expressly demands "compensatory damages due to [Rodgers's] libel and slander of Mathosian" (Docket Entry 4 at 15), and Mathosian could pursue the same relief for any new defamation, see, e.g., Fed. R. Civ. P. 15(d) ("[T]he court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."); see also Kramer v. Thompson, 947 F.2d 666, 679-80 (3d Cir. 1991) (citing -- as one ground for "revers[ing] those portions of the district court's orders that enjoined [the defendant] from repeating the statements deemed libelous" -- the absence of any "showing that [the defendant wa]s indigent . . . or that the threat of future damages [wa]s inadequate to deter [the

defendant] or to compensate [the plaintiff]"). Under these circumstances, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date weighs heavily against a claim of irreparable harm." Di Biase, 872 F.3d at 230 (internal ellipsis and quotation marks omitted).

Additionally, in addressing the irreparable harm element of the preliminary injunction standard, the Fourth Circuit has held that "a preliminary injunction is not warranted where, as here, the moving parties have not shown that they availed themselves of opportunities to avoid the injuries of which they now complain." Id. at 235. In that regard, the record (as detailed in Subsection I.B., Part I.C.ii., and Subsection I.D.) confirms that Mathosian (through his counsel) did not take reasonable steps to obtain an agreement from Rodgers to cease defamatory commentary. Of particular note, after Pasternak e-mailed McGuire for the purported purpose of inquiring "if [Rodgers] will agree to stop [making defamatory comments], so that [Mathosian] d[id]n't have to bring the [Preliminary Injunction M]otion" (Docket Entry 38-3 at 3), either (depending on which of Pasternak's accounts one credits):

1) Pasternak personally received McGuire's letter proposing a mutual non-disparagement agreement (on the day they agreed McGuire would respond (see Docket Entry 38-3 at 2)), Pasternak rejected that proposal sub silentio (because of the mutual nature of the proposal and/or because of its inclusion in a letter with other

-39-

proposals to resolve other issues in the case), and Pasternak allowed Cole to file the Preliminary Injunction Motion without discussing McGuire's proposal with Cole and without calling McGuire to seek modification of the proposal or clarification as to its severability from the other proposals in the letter[22] (despite the fact that McGuire explicitly invited further discussion (see Docket Entry 55-1 at 2)) (see Docket Entry 56 at 12, 19-20); or

2) Pasternak allowed Cole to file the Preliminary Injunction Motion before Pasternak personally received McGuire's letter proposing a mutual non-disparagement agreement, without following-up with McGuire about his promise to respond that day (which inquiry would have allowed McGuire to explain that he already had sent the letter, which Pasternak later realized had become stuck in his e-mail spam filter) (see Docket Entry 55 at 1).

Each of those alternatives reflects poorly on Pasternak and (particularly when considered in conjunction with the argument in Mathosian's Reply that Rodgers's willingness to enter a non-disparagement agreement would not moot the Preliminary Injunction Motion (see Docket Entry 45 at 3)) warrants the conclusion that

_____

[22] A review of the full text of the letter (Docket Entry 55-1 at 1-2) does not support the contentions made by Cole (see Docket Entry 56 at 9-10) and adopted by Pasternak (see id. at 12) that the letter clearly conditioned any non-disparagement agreement on resolution of other issues in the case; at a minimum, the letter left open the possibility of a stand-alone, non-disparagement agreement.

Mathosian (through his counsel) failed to undertake a genuine, good-faith effort to secure through voluntary means the very thing (i.e., an end to defamatory commentary) that the Preliminary Injunction Motion purports to seek.[23] Given that consideration, as well as the availability of a damages remedy for any (to this point, only speculatively forecast) future defamation, Mathosian has not shown a likelihood of irreparable harm as required to obtain a preliminary injunction.[24]

## C. Balance of Equities

To prevail on the Preliminary Injunction Motion, Mathosian must establish "that the balance of equities tips in his favor

---

[23] That judgment stands, even if (as Cole maintains (see Docket Entry 56 at 10)) McGuire (in a telephone conversation after Rodgers had incurred the cost of responding to the Preliminary Injunction Motion) no longer expressed interest in a non-disparagement agreement. By that point, Pasternak's conduct had substantially frustrated the purpose of such an agreement (as articulated in his original e-mail to McGuire (Docket Entry 38-3 at 3)), i.e., avoiding litigation of the Preliminary Injunction Motion.

[24] The deficiency of Mathosian's showing as to the likelihood of irreparable harm also further undermines his position regarding his likelihood of success on the merits. See Watson v. McGuire, Civil Action No. 15-1043, 2016 WL 7839114, at *4 (D.D.C. June 2, 2016) (unpublished) ("Finally the [c]ourt addresses [the p]laintiffs' likelihood of success on the merits. This depends on how likely [the p]laintiffs are to obtain the permanent injunction they ultimately seek. It is not a question of whether, as [the p]laintiffs suggest, they will satisfy the elements of their defamation . . . claim[]. If they are likely to prevail on th[at] claim[], but only ultimately to recover money damages, that is not a substantial likelihood [of success on the merits] that militates in favor of entering a preliminary injunction." (internal brackets, citation, and quotation marks omitted)).

. . . ." _Di Biase_, 872 F.3d at 230 (internal quotation marks omitted). To meet his burden in that regard, Mathosian has framed the competing interests as follows:

1) "Mathosian's reputation has been and continues to be harmed by Rodgers's false, defamatory statements" (Docket Entry 35 at 5) and preliminary injunctive relief "would protect Mathosian from such injury" (_id._); whereas,

2) "Rodgers would not be harmed at all if he is no longer allowed to make defamatory statements regarding Mathosian" (_id._), because "Rodgers has no protectable legal interest in making defamatory statements about Mathosian" (_id._).

Mathosian has grossly mis-calibrated both sides of the equitable balance. First, Mathosian's hearing testimony did not disclose _any_ reputational injury from defamatory statements by Rodgers. (_See_ Docket Entry 56 at 27-81.) Nor does it appear Mathosian could have offered any such evidence, as (a) Mathosian has conceded that Siemering –- the only person who allegedly received Rodgers's text message accusing Mathosian of lying (_see id._ at 39-40, 62-63), as well as the e-mail impliedly labeling Mathosian a sociopath (_see id._ at 38, 58, 61) –- and Cohn –- the only person who allegedly received Rodgers's e-mail repeating the theft-related charges in Prime's counterclaim (_see_ Docket Entry 56 at 44-45, 70-71) –- both subsequently spurned Rodgers and embraced Mathosian (_see_ Docket Entry 35 at 2; Docket Entry 56 at 61), and

(b) Mathosian has admitted the truthfulness of the statements Rodgers made about sales- and compensation-related issues in the e-mail sent to Prime staff (<u>see</u> Docket Entry 56 at 36-37, 53-57).

Second, Mathosian's proposed preliminary injunction would seriously harm Rodgers in that it would "amount[] to an overly broad prior restraint upon [his] speech, lacking plausible justification.  As such, the Constitution forbids it." <u>Tory v. Cochran</u>, 544 U.S. 734, 738 (2005) (internal citations omitted); <u>see also</u> <u>McCarthy v. Fuller</u>, 810 F.3d 456, 461 (7th Cir. 2015) ("'Prior restraint' is just a fancy term for censorship, which means prohibiting speech before the speech is uttered or otherwise disseminated.").  Specifically, Mathosian has proposed that the Court enjoin Rodgers from "making any libelous or slanderous statement about [] Mathosian" (Docket Entry 35-1 at 1), "any derogatory statement about [] Mathosian" (<u>id.</u>), and "any untrue statement about [] Mathosian" (<u>id.</u>).  Such an injunction would subject Rodgers to imprisonment and fines for contempt not only for <u>wholly unidentified statements</u> that a judge later deems false and defamatory, but also for <u>truthful, non-defamatory statements</u> that a judge later deems "derogatory," as well as <u>non-defamatory, non-derogatory statements</u> that a judge later deems "untrue."  Merely reciting the terms of the proposed preliminary injunction reveals its extreme overbreadth (and thus its patent unconstitutionality).

Under these circumstances, the equitable balance tilts decisively against Mathosian, for reasons well-articulated by another court (borrowing liberally from the words of the United States Supreme Court):

A "prior restraint on expression comes with a heavy presumption against its constitutional validity." Indeed, prior restraints are "the most serious and the least tolerable infringement on First Amendment rights."

When a prior restraint takes the form of a court-issued injunction, the risk of infringing on speech protected under the First Amendment increases. An injunction must be obeyed until modified or dissolved, and its unconstitutionality is no defense to disobedience. "If it can be said that a threat of . . . civil sanctions after publication 'chills' speech, a prior restraint 'freezes' it, at least for the time." In contrast, . . . "a judgment in a defamation case is subject to the whole panoply of protections afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted. Only after judgment has become final, correct or otherwise, does the law's sanction become fully operative."

Here, the [proposed] preliminary injunction broadly [would] prohibit[] . . . any statement that might, after it has been made, be construed as defamatory or even [derogatory]. . . . The risk of contempt sanctions may thus "freeze" . . . [speech that the enjoined party reasonably] perceives as legitimate . . ., rather than simply "chill" [such] speech, as might result from the threat of a subsequent damage award.

. . . .

. . . [Further, the proposed] preliminary injunction . . . (1) is not confined to specific statements but broadly covers any statement that might be hereafter found to be [derogatory, untrue,] or defamatory; and (2) is directed against statements that have not been finally adjudicated to be libelous.

. . . .

-44-

> . . . [Thus, the proposed preliminary] injunction is
> vague as to what [the enjoined party] may say and what
> statements might lead to a finding of contempt of court.
> It puts the [enjoined party] at risk of punishment for
> good faith efforts to advocate publicly its position [in
> a dispute] . . . .
>
> In the end, the vagueness of th[e proposed preliminary]
> injunction serves as sufficient reason to require that
> [the Court deny] it.

Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest.
Emps. Int'l Union, 239 F.3d 172, 176-78 (2d Cir. 2001) (internal
brackets, citations, ellipsis, and some internal quotation marks
omitted) (first quoting Organization for a Better Austin v. Keefe,
402 U.S. 415, 419 (1971); then quoting Nebraska Press Ass'n v.
Stuart, 427 U.S. 539, 559 (1976)); see also Ashcroft v. American
Civil Liberties Union, 535 U.S. 564, 573 (2002) ("[A]s a general
matter, the First Amendment means that government has no power to
restrict expression because of its message, its ideas, its subject
matter, or its content." (internal quotation marks omitted));
McCarthy, 810 F.3d at 461-62 ("An injunction must be specific about
the acts that it prohibits. . . . An injunction against defamatory
statements, if permissible at all, must not . . . forbid statements
not yet determined to be defamatory, for by doing so it could
restrict lawful expression. . . . As illustrative of the
injunction's resulting excessive breadth, notice that it . . .

would prevent [the enjoined party] from posting [even] nondefamatory messages . . .; it would thus enjoin lawful speech.").

## D. Public Interest

Finally, Mathosian has not established (and cannot establish) "that [the proposed preliminary] injunction is in the public interest," Di Biase, 872 F.3d at 230 (internal quotation marks omitted)). Just as the vague, overbroad, and unjustified prior restraint sought by Mathosian would harm Rodgers by violating his First Amendment rights, it likewise "ha[s] the potential to harm nonparties to the litigation because enjoining speech harms listeners as well as speakers." McCarthy, 810 F.3d at 461; see also id. at 462-63 ("'The First Amendment goes beyond protection of . . . the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.'" (internal bracket omitted) (quoting First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 783 (1978))); Ward v. Triple Canopy, Inc., No. 8:17CV802-T-24 MAP, 2017 WL 3149431, at *5 (M.D. Fla. July 25, 2017) (unpublished) (recognizing "strong public interest against imposing a prior restraint on speech and issuing a . . . preliminary injunction as to speech that has not yet been found defamatory"); Oliver v. Skinner, No. 4:09CV29, 2013 WL 667664, at *10 (S.D. Miss. Feb. 22, 2013) (unpublished) ("[T]he public interest is better served by a cautious approach to

injunctive relief in defamation cases. That is because 'prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights[.]'" (quoting Tory, 544 U.S. at 738)), aff'd, 552 F. App'x 357 (5th Cir. 2014); Thompson v. Hayes, 748 F. Supp. 2d 824, 833 (E.D. Tenn. 2010) ("[T]here is a public interest in protecting First Amendment rights.").

### III. CONCLUSION

Mathosian has not established grounds for preliminary injunctive relief.

**IT IS THEREFORE RECOMMENDED** that the Court deny Mathosian's Preliminary Injunction Motion (Docket Entry 35).

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

April 17, 2018