**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| WOLFE FINANCIAL INC. d/b/a, | ) | |
| INTEGRITY MORTGAGE GROUP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:17cv896 |
| | ) | |
| JOHN RODGERS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for recommendations on "Defendants Darrell Sparks, Tina Sparks, and Jared Sparks' [sic] Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6)" (Docket Entry 69) (the "Sparks Motion"),[1] "Defendants John Rodgers, Patrick Milligan, and Prime Mortgage Lending, Inc.'s Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)" (Docket Entry 67) (the "Rodgers Motion"), "Defendants' Rule 12(b)(6) Motion to Dismiss Second Amended Complaint" (Docket Entry 71) (the "Eli Motion") filed by Eli Global, LLC ("Eli"), Greg Lindberg ("Lindberg"), and TAC Investments, LLC ("TAC") (collectively, the "Eli Defendants"), and the "Motion to Dismiss Counterclaim Counts VI, VII and VIII and Incorporated Memorandum of Law" (Docket Entry 76) (the

---

    1 For legibility reasons, this Opinion omits all-cap, bold, and underlined font in all quotations from the headings and titles in the parties' materials.

"Counterclaim Motion") filed by Wolfe Financial Inc. d/b/a Integrity Mortgage Group ("Integrity") and Matthew Mathosian ("Mathosian") (at times, collectively, the "Counterclaim Defendants"). For the reasons that follow, the Court should grant in part and deny in part the Sparks Motion; grant the Rodgers Motion and Eli Motion; and deny the Counterclaim Motion.

## BACKGROUND

Asserting breach of contract and tort claims, Counterclaim Defendants and Marian Siemering ("Siemering") (collectively, the "Plaintiffs")[2] initiated this lawsuit on October 5, 2017, against Patrick Milligan ("Milligan"), John Rodgers ("Rodgers"), Darrell Sparks, Jared Sparks, and Tina Sparks (collectively, the "Individual Defendants"), as well as Prime Mortgage Lending Inc. ("Prime") and Eli Defendants (collectively, the "Corporate Defendants"). (See, e.g., Docket Entry 1 (the "Complaint") at 1, 2.)[3] Five days later, Plaintiffs filed an Amended Complaint against Individual Defendants and Corporate Defendants (collectively, the "Defendants"). (See Docket Entry 4.) After Defendants filed various motions to dismiss (see Docket Entries 17, 19, 25), Plaintiffs filed a motion to amend the Amended Complaint

_____

[2] This Opinion defines "Plaintiffs," "Individual Defendants," "Corporate Defendants," and "Defendants" to match the Complaint's definition of those terms. (See Docket Entry 1 at 1; see also Docket Entry 63 at 1 (same).)

[3] Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

(Docket Entry 32) and, a few days later, a motion for temporary restraining order and preliminary injunction (Docket Entry 35) (the "Preliminary Injunction Motion").  The undersigned conducted a hearing on the Preliminary Injunction Motion (<u>see</u> Docket Entry 53) and recommended its denial (<u>see generally</u> Docket Entry 61), which recommendation the Court (per Chief United States District Judge Thomas D. Schroeder) adopted (<u>see</u> Docket Entry 66 at 1).

The Court (per the undersigned) also granted Plaintiffs leave to amend their pleading (<u>see</u> Text Order dated Apr. 27, 2018), prompting the filing of Plaintiffs' "Second Amended Complaint, Injunctive Relief Requested, and Demand for Jury Trial" (Docket Entry 63) (the "Second Amended Complaint").  As Exhibit A to the Second Amended Complaint, Plaintiffs submitted a "Producing Branch Manager Employment Agreement" between Integrity and Darrell Sparks. (Docket Entry 64 (the "Employment Agreement") at 1; <u>see also</u> Docket Entries 1-1, 4-1.)  In response, Defendants variously moved to dismiss the Second Amended Complaint and/or certain claims therein. (<u>See</u> Docket Entries 67, 69, 71.)  Prime also asserted multiple counterclaims against Integrity and Mathosian.  (<u>See</u> Docket Entry 73 at 11-36 (the "Counterclaims").)  In turn, Integrity and Mathosian seek dismissal of certain such counterclaims. (<u>See</u> Docket Entries 76, 85.)

As relevant to the various dismissal motions, the Second Amended Complaint alleges:

"[A] premier mortgage lender that offers a variety of purchase and refinancing programs" (Docket Entry 63, ¶ 17), "Integrity is based in Asheboro, North Carolina, with branches across the United States" (id., ¶ 18). "[A] mortgage lender based in Apex, North Carolina, with branches across the United States" (id., ¶ 19), "Prime is a direct competitor to Integrity in the mortgage lending industry" (id., ¶ 9). "Lindberg owns Eli" (id., ¶ 22), which owns TAC (id., ¶ 20), which "owns 50% of Prime" (id., ¶ 21). Rodgers owns the other 50% of Prime. (See id., ¶ 7.) Previously Prime employees (id., ¶ 33), Siemering and Mathosian currently work for Integrity (id., ¶¶ 2, 3). A North Carolina resident, Milligan previously worked for Prime. (Id., ¶ 10.) Residents of Kentucky, Darrell, Tina, and Jared Sparks formerly worked for Integrity and now work for Prime. (Id., ¶¶ 11-13.)

Notwithstanding this Kentucky residence, the Court possesses personal jurisdiction over the Sparkses because

- they have specifically directed their activities at this forum by virtue of their employment with Integrity;

- this litigation arises out of those activities;

- they have signed employment contracts with Integrity, which is located in this forum;

- they have continually communicated with Integrity;

- they were paid by Integrity;

<ul>
<ul>
<li>○　-their payroll, benefits, and medical coverage was provided by Integrity;</li>
</ul>
<li>● they had an ongoing employment relationship with Integrity; and</li>
<li>● Integrity felt harm in this forum due to the Sparks' [sic] actions.</li>
</ul>

(<u>Id.</u>, ¶ 15 (bullets in original).)

"On information and belief, the Corporate Defendants collectively exercise actual control over Prime and Rodgers, and by virtue of that control, exercise control over the other Defendants." (<u>Id.</u>, ¶ 23.) Also "on information and belief[,] the Corporate Defendants actively participated in and encouraged the activities alleged[,] . . . . are the alter-ego of the other defendants[,] . . . and control Prime, Rodgers, and the other defendants." (<u>Id.</u>) "During the week of January 16, 2017, Milligan, while an employee of Prime, was seen at an Integrity office in Kentucky managed by Defendant Darrell Sparks, then an Integrity employee. This came to Mathosian's attention by way of a conversation with Milligan." (<u>Id.</u>, ¶ 24.) "Mathosian learned that Milligan was assisting Darrell Sparks (the branch manager), Jared Sparks, and Tina Sparks, then all Integrity employees, without authorization, . . . on how to export loans from Integrity's Encompass System and import them into the Prime Encompass System. These are systems for tracking loan information." (<u>Id.</u>, ¶ 25.) "In other words, they were stealing Integrity's loans from Integrity for Prime." (<u>Id.</u>)

"Milligan stated to Mathosian that he was there at the request of his manager, Rodgers, and that he was sent for two full weeks to transition the entire Integrity branch to Prime." (Id., ¶ 26.) Accordingly, Integrity decided "to terminate the Kentucky branch and its access to Integrity's Encompass System, on January 18, 2017. This was a severe loss to Integrity." (Id., ¶ 27.) Additionally, "[s]everal loans that were initially Integrity's closed at Prime." (Id., ¶ 28.) "On information and belief, the Corporate Defendants were all actively involved with and supported this operation." (Id., ¶ 29.)

"Plaintiffs enjoy existing business relationships with borrowers as well as the expectancy of business relationships with potential borrowers who indicate an interest in engaging Plaintiffs' services." (Id., ¶ 59.) "More specifically, Integrity had contracts with at least" thirteen specified individuals (id., ¶ 60), and, "[o]n information and belief, Defendants knew of the contracts and intentionally induced the borrowers not to perform the contracts" (id., ¶ 61). "Plaintiffs and their borrowers were and are in an economic relationship that benefitted and benefits Plaintiffs economically, and likely would have continued to benefit Plaintiffs in the future." (Id., ¶ 62.) "But for Defendants' actions, the borrowers would have entered into future contracts with Plaintiffs." (Id., ¶ 63.) "Defendants were aware of the relationships that Plaintiffs enjoyed with Plaintiffs' borrowers"

(id., ¶ 64) and "intentionally interfered with these existing and prospective relationships by diverting borrowers to Prime, in many cases, on information and belief, without the borrowers' knowledge that this was occurring" (id., ¶ 65). "Through their actions, Defendants induced and/or caused a termination of these relationships or expected relationships" (id., ¶ 66), harming Plaintiffs through "loss of business and goodwill" (id., ¶ 67). "In addition, Plaintiffs had the reasonable expectation of future business with the same borrowers" (id., ¶ 68), and "Defendants' actions induced the borrowers not to enter into contracts with Plaintiffs that would have resulted but for Defendants' interference" (id., ¶ 69).

Further, clients and potential clients

provide[] Integrity with a wide variety of personal confidential information such as income and prior mortgage information, Social Security numbers, dates of birth, contact information, sensitive credit history, bank account numbers, mortgage amounts, tax returns, employment history, and all of the financial information that is necessary to facilitate a home loan. Integrity's potential clients provide such information to Integrity with the understanding that Integrity will protect this highly private information. Integrity and its employees are required to maintain the privacy of this information by extremely strict federal laws that carry substantial penalties if violated, such as the Gramm-Leach-Bliley Act. This information, thus, becomes a trade secret of Integrity (the "Trade Secrets").

Integrity does not release, share, or disclose such Trade Secrets to the general public. Integrity maintains the secrecy of the Trade Secrets and derives an economic and competitive advantage from maintaining the non-disclosure of such information. If a competitor obtained this information, as Prime did, it could and did

> undercut Integrity on Integrity's loans and divert Integrity's clients by aggressively pursuing those clients based on the information kept by Integrity.

(Id., ¶¶ 30, 31 (internal paragraph number omitted).) "The Individual Defendants improperly and unlawfully accessed and disclosed these Trade Secrets to Prime, with the Corporate Defendants' assistance, and Prime utilized such Trade Secrets to Plaintiffs' detriment." (Id., ¶ 50.)

Finally, "Darrell Sparks, Tina Sparks, and Jared Sparks all had contractual and employment agreements with Integrity that required them to work only for Integrity and to be loyal to Integrity alone. See Exhibit A." (Id., ¶ 71; see also id., ¶ 72 ("Their activity breached these contracts and caused damage to Plaintiffs.").) "At Integrity, Tina Sparks managed marketing, sent out flyers, promoted the business with realtors, and assisted with various office tasks such as ordering office supplies." (Id., ¶ 76.) Jared Sparks worked as a mortgage loan processor at Integrity. (Id., ¶ 77.) "His duties and responsibilities" (id.) consisted of:

- Performing a general evaluation of applications (financial documents, mortgage type, etc.)

- Ordering needed third party verifications to help substantiate income and job history working with various Integrity vendors to accomplish this

- Gathering all important data from client (assets, debts etc.) — copies of W2s, pay stubs, bank statements, IDs, etc.

8

(Id. (bullets in original).)  Darrell Sparks served as "a loan

officer" at Integrity.  (Id., ¶ 75.)  In that capacity,

his duties and responsibilities were as follows:

- Evaluating credit worthiness by processing loan applications and documentation within specified limits.  This involved pulling the applicant's credit through IMG vendors

- Interviewing applicants to determine financial eligibility and feasibility of granting loans

- Determining all applicable ratios and metrics and setting up debt payment plans

- Communicating with clients either to request or to provide information

- Justifying decisions (approvals/rejections) and reporting on them

- This involved constant communication with the home office (Asheboro Team) and underwriters to fully comprehend the creditworthiness of the borrower(s) as determined by the loan officer

- Completing loan contracts and counseling clients on policies and restrictions

- Updating job knowledge on types of loans and other financial services

- Maintaining and updating account records

- Assessing customer needs, exploring all options and introducing different types of loans

- Developing referral networks, suggesting alternate channels and cross-selling products and services to accomplish quotas

- Going the "extra mile" to build trust relationships, customer loyalty and satisfaction throughout the underwriting process

- Operating in compliance with laws and regulations and adhering to lending compliance guidelines, as dictated and managed by the corporate compliance team

- Helping to schedule closings and request closing documents from the closers in the Asheboro office

- Quoting rates and locking loans with the corporate lockdesk per the borrowers [sic] direction

- Submitting payroll, approving hourly employees [sic] time, submitting expense reports

- Managing the pipeline to ensure that loans progress through the system properly

(Id., ¶ 75 (bullets in original).)  "By virtue of these responsibilities, each of the Sparks[es] had such control that Integrity was subject to domination by each of the Sparks[es]." (Id., ¶ 78.)  "Darrell Sparks, Tina Sparks, and Jared Sparks all had a fiduciary duty with Integrity to work only for it and a duty to be loyal to it alone due to their responsibility and positions at Integrity, and due to their employment agreements."  (Id., ¶ 79.)  "Their activity breached these fiduciary duties and duties of loyalty and caused damage to Plaintiffs."  (Id., ¶ 80.)

## DISCUSSION

### I. Sparks Motion

Darrell, Jared, and Tina Sparks seek dismissal of the Second Amended Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure (the "Rules").  (See Docket Entry 69 at 1, 2.)  "To the extent the Court does have personal jurisdiction over the Sparks[es]," though, they

seek Rule 12(b)(6) dismissal of Plaintiffs' claims for "tortious interference (Count IV), breach of fiduciary duty and loyalty (Count VI), and violations of the Computer Fraud and Abuse Act ('CFAA') (Count [VIII])." (Id. at 2.) Plaintiffs oppose the Rule 12(b)(2) request as well as the Rule 12(b)(6) request on the tortious interference claim as to all three Sparkses and on the fiduciary duty claim as to Darrell and Jared Sparks. (See Docket Entry 87 at 1-5.) However, Plaintiffs agree to dismissal of their fiduciary duty claim (Count VI) against Tina Sparks and their CFAA claim (Count VIII) against all three Sparkses. (See id. at 5, 6.)

## A. Personal Jurisdiction Challenge

### i.  Relevant Standards

In response to a defendant's Rule 12(b)(2) challenge, the plaintiff must ultimately prove the existence of personal jurisdiction by a preponderance of the evidence. Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003). If a court considers a pretrial personal jurisdiction challenge without conducting an evidentiary hearing, though, the plaintiff need only "mak[e] a prima facie showing in support of [the] assertion of jurisdiction." Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014). In such circumstances, the "[C]ourt must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the

existence of jurisdiction." Id. (internal quotation marks omitted). The Court must also construe all "conflicting facts in the parties' affidavits and declarations in the light most favorable to [the plaintiff]." Id. at 560.

The Court may exercise jurisdiction over the Sparkses if (1) North Carolina's long-arm statute authorizes it and (2) the exercise of jurisdiction comports with due process under the Fourteenth Amendment. Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001). Moreover,

> [t]he North Carolina Supreme Court has held that [North Carolina General Statute Section] 1-75.4(1)(d) permits the exercise of personal jurisdiction over a defendant to the outer limits allowable under federal due process. *See Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 231 S.E.2d 629, 630 (1977) ("[I]t is apparent that the [North Carolina] General Assembly intended to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process."); *see also Combs*[ *v. Bakker*, 886 F.2d 673,] 676 n.3 [(4th Cir. 1989)] (same).

Universal Leather, 773 F.3d at 558 (footnote omitted) (second and third sets of brackets in original). Accordingly, if a plaintiff asserts jurisdiction under Section 1-75.4(1)(d), the United States Court of Appeals for the Fourth Circuit has held that the "two-prong test merges into the single question whether [the plaintiff] has made a prima facie showing that [the defendant] had sufficient contacts with North Carolina to satisfy constitutional due process." Id. at 558-59.

"This does not of course relieve the plaintiffs of the burden ultimately to prove the existence of statutory grounds by a preponderance of evidence, whether in a separate evidentiary hearing adequate to resolve dispositive factual questions, or as an incident to trial on the merits." Combs, 886 F.2d at 677. As such, if, "even under [Section] 1-75.4(1)(d)'s very broad terms, the facts of th[e] case fail to invoke jurisdiction," that provision cannot "authorize[] the exercise of [the Court's] jurisdiction." Skinner v. Preferred Credit, 361 N.C. 114, 119-20, 638 S.E.2d 203, 208-09 (2006) (explaining that, although "[t]his Court has stated that the enactment of [Section] 1-75.4(1)(d) was 'intended to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process[,]' . . . . by its plain language the statute requires some sort of 'activity' to be conducted by the defendant within this state," and finding that the proffered activities failed to satisfy Section 1-75.4(1)(d) (quoting Dillon, 291 N.C. at 676, 231 S.E.2d at 630)); see also id. at 129-30, 638 S.E.2d at 214-15 (Timmons-Goodson, J., dissenting) (explaining that "[t]his Court last addressed whether a defendant was engaged in substantial activity in this state pursuant to [Section] 1-75.4(1)(d) in Dillon" and that, "if the defendant in Dillon engaged in substantial activity in North Carolina . . ., there is substantial activity in the instant case"); id. at 133, 638 S.E.2d at 216 (stating, in regard to the

13

first step of the jurisdictional analysis, "I would hold that both [Sections] 1-75.4(1)(d) and (6)(b) allow courts of this state to assert *in personam* jurisdiction over [the] defendant," and then noting that "the second inquiry in the jurisdictional analysis is whether the exercise of *in personam* jurisdiction over [the] defendant by courts of this state would violate due process of law under the United States Constitution").

Indeed, "[a] determination that the long-arm statute does not authorize jurisdiction ends the inquiry." Stanton Barrett Motorsports, LLC v. Innovative Techs. Corp. of Am., No. COA 08-983, 195 N.C. App. 460, 673 S.E.2d 166 (table), 2009 WL 368577, at *2 (2009) (unpublished) (internal quotation marks omitted); see also Vision Motor Cars, Inc. v. Valor Motor Co., 981 F. Supp. 2d 464, 472 (M.D.N.C. 2013) ("Absent any evidence that any defendant was engaged in solicitation or services activities at any point in North Carolina, the plaintiff's action is not authorized by North Carolina's long-arm statute. Therefore, the Court lacks personal jurisdiction over the defendants and the action will be dismissed."). However, if the long-arm statute authorizes jurisdiction, then the analysis turns to whether exercise of jurisdiction comports with due process. See Brown v. Ellis, 363 N.C. 360, 363, 678 S.E.2d 222, 223 (2009) ("To ascertain whether North Carolina may assert personal jurisdiction over a nonresident defendant, we employ a two-step analysis. Jurisdiction over the

action must first be authorized by [Section] 1-75.4. 'Second, if the long-arm statute permits consideration of the action, exercise of jurisdiction must not violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.'" (citation omitted) (quoting Skinner, 361 N.C. at 119, 638 S.E.2d at 208 (majority opinion))); see also Johnston Cty. v. R.N. Rouse & Co., 331 N.C. 88, 95-96, 414 S.E.2d 30, 35 (1992) ("As we recognized in Dillon, resolving the question of the existence of in personam jurisdiction involves a two-step inquiry. A court attempting to exercise personal jurisdiction over a nonresident defendant must first determine whether a statute, such as [Section] 1-75.4(5), permits the court to entertain an action against the defendant. If there is a statute authorizing the court to act, the court must further determine whether the nonresident defendant has sufficient, minimum contacts with the state so that maintenance of the suit within the courts of North Carolina will not offend traditional notions of fair play and substantial justice." (citations and internal quotation marks omitted)).

As to that second step, "[a] court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in that state 'does not offend traditional notions of fair play and substantial justice.'" Carefirst, 334 F.3d at 397 (quoting International Shoe

15

Co. v. Washington, 326 U.S. 310, 316 (1945)). To satisfy the minimum contacts test, the plaintiff must "show that the defendant 'purposefully directed his activities at the residents of the forum' and that the plaintiff's cause of action 'arise[s] out of' those activities." Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 277 (4th Cir. 2009) (brackets in original) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). This test "ensure[s] that the defendant is not 'haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts,'" and thus "protects a defendant from having to defend himself in a forum where he should not have anticipated being sued." Id. (quoting Burger King, 471 U.S. at 475).

"In judging minimum contacts, a court properly focuses on the relationship among the defendant, the forum, and the litigation." Calder v. Jones, 465 U.S. 783, 788 (1984) (internal quotation marks omitted). Two methods for achieving personal jurisdiction exist: (1) "specific jurisdiction," in which the defendant's qualifying contacts with North Carolina constitute the basis for the litigation, and (2) "general jurisdiction," which occurs when a defendant's "affiliations with [North Carolina] are so 'continuous and systematic' as to render [it] essentially at home in [North Carolina]." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011). Here, Plaintiffs rely on specific

jurisdiction for their claims against the Sparkses. (See Docket Entry 87 at 2.)

"In determining whether specific jurisdiction exists, [courts] consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" Carefirst, 334 F.3d at 397. In analyzing specific jurisdiction, a court must focus on the nature and quality of the defendant's contacts with the forum. Id. Notably, however, a court "should not 'merely . . . count the contacts and quantitatively compare this case to other preceding cases.' Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of 'fair play and substantial justice' is not thereby offended." Id. (ellipsis in original) (citation omitted).

"The purposeful-availment test is flexible, and [the] analysis proceeds on a case-by-case basis." Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 302 (4th Cir. 2012). In the contractual context, purposeful availment occurs if "the contract has a substantial connection with the forum state. The parties' negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing, must be

17

considered in determining whether the defendant purposefully established minimum contacts in the forum state." Tubular Textile Mach. & Compax Corp. v. Formosa Dyeing & Finishing, Inc., No. 4:96cv391, 1997 WL 33150812, at *4 (M.D.N.C. Jan. 29, 1997) (citation omitted) (first citing McGee v. International Life Ins. Co., 355 U.S. 220, 223 (1957); then citing Burger King, 471 U.S. at 479). In this regard, "[i]t is well established that where a defendant deliberately creates continuing obligations between [him]self and a forum entity, [he] has availed [him]self of the privilege of conducting business there, and where [his] 'activities are shielded by the "benefits and protections" of the forum's laws it is presumptively not unreasonable to require [him] to submit to the burdens of litigation in that forum as well.'" Id. at *5 (quoting Burger King, 471 U.S. at 476).

Additionally, in the context of intentional torts, courts may assess purposeful availment through the so-called "'effects test.'" Carefirst, 334 F.3d at 397-98 & n.7. Under this test, the plaintiff must show "that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." Id. at 398 n.7.

**ii. Analysis**

Here, Plaintiffs identify no portion of the long-arm statute that provides jurisdiction over the Sparkses.  (See Docket Entry 87 at 1-3.)  Instead, Plaintiffs assert that

> North Carolina's long-arm statute "runs coextensive with the federal Due Process Clause, thereby collapsing the two-step process 'into a single inquiry' as to whether the nonresident defendant has such 'minimal contacts' with North Carolina that exercising jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'" *Wright v. Zacky & Sons Poultry, LLC*, 105 F. Supp. 3d 531, 536 (M.D.N.C. 2015) (citing *Christian Sci.*[, 259 F.3d 209]).  The facts laid out in Plaintiffs' Second Amended Complaint are sufficient to establish that the Sparks[es] have sufficient minimum contacts with North Carolina to support specific jurisdiction for Plaintiffs' counts against the Sparks[es].

(Id. at 2.)  Thus, Plaintiffs appear to rely on Section 1-75.4(1)(d) as the statutory grounds for their jurisdictional contentions.  This provision authorizes the exercise of jurisdiction "[i]n any action, whether the claim arises within or without [North Carolina], in which a claim is asserted against a party who when service of process is made upon such party[] . . . [i]s engaged in substantial activity within [North Carolina], whether such activity is wholly interstate, intrastate, or otherwise."  N.C. Gen. Stat. § 1-75.4(1)(d).

Even "constru[ing] all relevant pleading allegations in the light most favorable to [Plaintiffs] . . . and draw[ing] the most favorable inferences for the existence of jurisdiction," Universal Leather, 773 F.3d at 558 (internal quotation marks omitted),

19

however, Plaintiffs fail to satisfy the "plain language [of] the statute[, which] requires some sort of 'activity' to be conducted by the defendant within this state," Skinner, 361 N.C. at 119, 638 S.E.2d at 208, "when service of process is made upon such [defendant]," N.C. Gen. Stat. § 1-75.4(1)(d). Here, Plaintiffs seek to establish the requisite North Carolina connections of the Sparkses by focusing on their employment with Integrity. (See Docket Entry 63, ¶¶ 11-13, 15, 24-27, 71-81.)[4] Yet, Plaintiffs terminated the Sparkses' employment "on January 18, 2017" (id., ¶ 27; see also id., ¶¶ 11-13 (describing the Sparkses as "former employee[s] of Integrity")), and did not achieve service of process on the Sparkses until October 2017 (see Docket Entry 8 at 1).[5] Accordingly, "even under [Section] 1-75.4(1)(d)'s very broad terms, the facts of this case fail to invoke jurisdiction." Skinner, 361 N.C. at 120, 638 S.E.2d at 209.

---

4 The Second Amended Complaint alleges that the Sparkses now work for Prime, a North Carolina corporation, but provides no further allegations regarding that employment or any resulting interactions with North Carolina. (See generally Docket Entry 63.) Notably, though, the Sparkses specifically aver that they "do not conduct any business in North Carolina, do not solicit any business in North Carolina, and do not have any customers in North Carolina" (Docket Entry 70-1, ¶ 4; Docket Entry 70-2, ¶ 4; Docket Entry 70-3, ¶ 4), and they generally disclaim any North Carolina connections. (See Docket Entries 70-1, 70-2, 70-3.) Hence, even assuming that Plaintiffs sought to rely on such employment, they have not shown that the Sparkses' employment with Prime satisfies the requirements of Section 1-75.4(1)(d).

5 Indeed, Plaintiffs did not initiate this lawsuit until October 2017. (See Docket Entry 1 at 14.)

Nevertheless, as to Darrell Sparks, another provision of the long-arm statute appears potentially relevant. The "Local Services, Goods or Contracts" provision authorizes jurisdiction "[i]n any action which," <u>inter alia</u>:

> a. Arises out of a promise, made anywhere to the plaintiff or to some third party for the plaintiff's benefit, by the defendant to perform services within this State or to pay for services to be performed in this State by the plaintiff; or
>
> b. Arises out of services actually performed for the plaintiff by the defendant within this State, or services actually performed for the defendant by the plaintiff within this State if such performance within this State was authorized or ratified by the defendant; . . . .

N.C. Gen. Stat. § 1-75.4(5). Plaintiffs submitted Darrell Sparks's Employment Agreement (<u>see</u> Docket Entry 64), which specifies that his duties include "[i]dentifying potential mortgagors, acquiring a full understanding of, and analyzing, their respective financial needs, based on their individual financial health, economic goals and credit history" (<u>id.</u> at 12) as well as "[o]verseeing the loan transaction from initiation, through processing, approval, closing and recording" (<u>id.</u> at 13). According to the Second Amended Complaint, these activities "involved [Darrell Sparks's] constant communication with the home office (Asheboro Team) and underwriters to fully comprehend the creditworthiness of the borrower(s) as determined by [Darrell Sparks]," as well as his "request[ing] closing documents from the closers in the Asheboro office."

(Docket Entry 63, ¶ 75.)[6]  Construed "in the light most favorable

to [Plaintiffs] . . . and draw[ing] the most favorable inferences

for the existence of jurisdiction," Universal Leather, 773 F.3d at

558 (internal quotation marks omitted), these allegations appear to

satisfy Section 1-75.4(5)(a) and/or Section 1-75.4(5)(b).[7]

As such, Plaintiffs make a prima facie showing that North

Carolina's long-arm statute authorizes jurisdiction over Darrell

---

6  Conversely, the Second Amended Complaint does not allege
that the duties of Jared or Tina Sparks included any interaction
with North Carolina.  (See id., ¶¶ 76, 77.)

7  Neither Darrell Sparks nor Plaintiffs addressed the
substance of the Employment Agreement and the impact of its
provisions on the jurisdictional analysis. (See Docket Entries 69,
70, 70-1, 83, 87.)  It bears noting, though, that in the Employment
Agreement, Darrell Sparks consented to the exercise of personal
jurisdiction in North Carolina for disputes regarding the
Employment Agreement.  (See Docket Entry 64 at 8 ("Unless
prohibited by applicable law, or otherwise agreed to by the
Parties, the Parties expressly agree and consent that the courts of
Randolph County, State of North Carolina shall have exclusive
jurisdiction over all actions arising from, out of, or with respect
to this Agreement.").)  Where "a party has validly consented to the
jurisdiction of a court, it is not necessary to conduct th[e usual]
two-step [jurisdictional] determination because the person has
waived any right to object to the court's exercise of in personam
jurisdiction."  Johnston Cty., 331 N.C. at 96, 414 S.E.2d at 35
(citing Burger King, 471 U.S. at 472 n.14).  Regardless of whether
or not Darrell Sparks waived his ability to object to jurisdiction
in the United States District Court for the Middle District of
North Carolina, which encompasses Randolph County, see 28 U.S.C.
§ 113(b), this jurisdictional consent provision further supports
the Court's exercise of jurisdiction over him.  See Retail Inv'rs,
Inc. v. Henzlik Inv. Co., 113 N.C. App. 549, 552-53, 439 S.E.2d
196, 198 (1994) (explaining that "[a] defendant may . . . consent
to personal jurisdiction and in such event, the two step inquiry is
unnecessary to the exercise of personal jurisdiction over the
defendant," and affirming denial of jurisdictional dismissal
motions given jurisdictional consent provision in relevant
agreement).

Sparks, but not over Tina and Jared Sparks. Accordingly, the Court should dismiss this action as to Tina and Jared Sparks under Rule 12(b)(2). See Vision Motor, 981 F. Supp. 2d at 472 ("[T]he plaintiff's action is not authorized by North Carolina's long-arm statute. Therefore, the Court lacks personal jurisdiction over the defendants and the action will be dismissed."); Stanton Barrett, 2009 WL 368577, at *2-3 (affirming dismissal for lack of jurisdiction where "exercise of personal jurisdiction was not authorized by N.C. Gen. Stat. § 1-75.4," without "reach[ing] the issue of due process," id., 2009 WL 368577, at *2).

"In the alternative, the Court [should] find[] that asserting personal jurisdiction over [Jared and Tina Sparks] would not comport with due process." Vision Motor, 981 F. Supp. 2d at 473. Turning first to the contractual purposeful-availment test, Plaintiffs neither submitted any employment agreement for Jared or Tina Sparks (see Docket Entries 1-1, 4-1, 64) nor alleged that any employment agreement with them contained a North Carolina choice-of-law, forum-selection, or consent-to-jurisdiction provision (see generally Docket Entry 63). Moreover, as detailed in the Second Amended Complaint, Jared and Tina Sparks did not interact with North Carolina in fulfilling their employment duties with Integrity. (See id., ¶¶ 76, 77.)

Thus, the record reflects that the only connection to North Carolina of Jared and Tina Sparks remains the fortuitous fact that

their (current and previous) employer qualifies as a North Carolina resident (see id., ¶¶ 1, 8).[8] That connection fails to justify the exercise of jurisdiction over Jared and Tina Sparks. See Walden v. Fiore, 571 U.S. 277, 285-86 (2014) ("[O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there. . . . [T]he plaintiff cannot be the only link between the defendant and the forum. . . . [A] defendant's relationship with

_____

[8] Plaintiffs argue that specific jurisdiction over "the Sparks[es]" exists because "they were paid by Integrity" and "their payroll, benefits, and medical coverage was provided by Integrity." (Id., ¶ 15.) In this regard, though, "the [Second Amended Complaint] is significant for what it does not say. [Plaintiffs] ha[ve] not alleged that [they paid the Sparkses and provided their benefits and medical coverage from within North Carolina], despite this fact being within the direct knowledge of [Plaintiffs]." Pan-American Prods. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 682 (M.D.N.C. 2011). Given that Integrity has "branches across the United States" (Docket Entry 63, ¶ 18), the Sparkses worked only at "an Integrity office in Kentucky" (id., ¶ 24; see id., ¶¶ 24-27; see also Docket Entry 70-1, ¶ 6; Docket Entry 70-2, ¶ 6; Docket Entry 70-3, ¶ 6), and the Second Amended Complaint does not suggest that payroll processing or any other human resource functions occurred in North Carolina (see Docket Entry 63, ¶¶ 15, 75), the Court cannot infer that Plaintiffs paid the Sparkses (or provided any other benefits) from within North Carolina. This case thus differs from the remote-employment decision upon which Plaintiffs rely (see Docket Entry 87 at 2-3 (discussing Numeric Analytics, LLC v. McCabe, 161 F. Supp. 3d 348 (E.D. Pa. 2016))). In that case, evidence established that all "back office personnel management," email, timekeeping, and billing customers "occurred in Pennsylvania," the only location where the plaintiff possessed an office, and "[the p]laintiff paid [the d]efendants' salaries using a Pennsylvania bank," thereby justifying Pennsylvania jurisdiction over employees who worked remotely, although even with all those facts, the court "believe[d] the question [wa]s close." Numeric Analytics, 161 F. Supp. 3d at 355.

24

a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."). Plaintiffs therefore fail to satisfy the contractual purposeful-availment test as to Jared and Tina Sparks.

Plaintiffs similarly fail to satisfy the tort-related purposeful-availment test as to Jared and Tina Sparks. Put simply, the record lacks any indication that Jared and Tina Sparks "expressly aimed [their] tortious conduct at [North Carolina], such that [North Carolina] can be said to be the focal point of the tortious activity." Carefirst, 334 F.3d at 398 n.7. In this regard, the Second Amended Complaint alleges only that, at their office in Kentucky, the Sparkses worked with Milligan "to export loans from Integrity's Encompass System and import them into the Prime Encompass System." (Docket Entry 63, ¶ 25; see id., ¶¶ 24, 27.) Nothing in the current record indicates that this activity involved North Carolina,[9] let alone that North Carolina constituted "the focal point of the tortious activity," Carefirst, 334 F.3d at 398 n.7. (See generally Docket Entry 63.) That "Integrity felt harm in this forum due to the Sparks' [sic] actions" (id., ¶ 15) does not change this analysis. See Walden, 571 U.S. at 290 ("Calder made clear that mere injury to a forum resident is not a

_____

    9  Notably, Plaintiffs did not provide potentially relevant information regarding Integrity's Encompass System, including, for instance, where it houses the Encompass System or how individuals access said system. (See Docket Entry 63.)

sufficient connection to the forum. . . . The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").

In sum, because Plaintiffs have not established that due process permits the exercise of jurisdiction over Jared and Tina Sparks, the Court should dismiss them under Rule 12(b)(2).

Conversely, the record reflects that Darrell Sparks entered into a contract with a North Carolina corporation (see Docket Entry 64 at 1; Docket Entry 63, ¶ 1) that contained a North Carolina choice-of-law provision, a North Carolina forum-selection provision, and a North Carolina consent-to-jurisdiction provision. (See Docket Entry 64 at 8.)[10]  To fulfill his duties under this contract, for nearly two years (compare id. at 1 (specifying effective date of April 1, 2015), with Docket Entry 63, ¶ 27

_____

        10  More specifically, Section 6.6 of the Employment Agreement states:

        To the maximum extent permitted under applicable law, th[e Employment] Agreement shall be governed by and construed in accordance with the substantive laws of Federal law and the laws of the State of North Carolina, without regard to provisions related to choice of law or forum.  Unless prohibited by applicable law, or otherwise agreed to by the Parties, the Parties expressly agree and consent that the courts of Randolph County, State of North Carolina shall have exclusive jurisdiction over all actions arising from, out of, or with respect to th[e Employment] Agreement. . . .

(Id.)

(identifying termination date of January 18, 2017)), Darrell Sparks engaged in "constant communication with the home office (Asheboro Team)" and "[h]elp[ed] to schedule closings and request[ed] closing documents from the closers in the Asheboro office" (Docket Entry 63, ¶ 75). As such, "the [Employment] Agreement has a substantial connection to North Carolina, and [Darrell Sparks] can fairly be said to have purposefully availed [himself] of the privilege of conducting activities in North Carolina." Epic Tech, LLC v. STHR Grp., LLC, No. 1:15cv252, 2015 WL 8179513, at *8 (M.D.N.C. Dec. 7, 2015), report and recommendation adopted, No. 1:15-CV-252, 2015 WL 9592522 (M.D.N.C. Dec. 31, 2015); see also Tubular Textile, 1997 WL 33150812, at *5 ("It is well established that where a defendant deliberately creates continuing obligations between [him]self and a forum entity, [he] has availed [him]self of the privilege of conducting business there, and where [his] 'activities are shielded by the "benefits and protections" of the forum's laws it is presumptively not unreasonable to require [him] to submit to the burdens of litigation in that forum as well.'" (quoting Burger King, 471 U.S. at 476)).

Upon satisfaction of the purposeful-availment test,[11] the question turns to whether Plaintiffs' "claims arise out of those activities directed at the state." Carefirst, 334 F.3d at 397. "The analysis here is generally not complicated." Tire Eng'g, 682 F.3d at 303. Plaintiffs' claims relate to Darrell Sparks's alleged "stealing Integrity's loans from Integrity for Prime" (Docket Entry 63, ¶ 25), in violation of the provision in his Employment Agreement that "required [him] to work only for Integrity and to be loyal to Integrity alone" (id., ¶ 71; see also Docket Entry 64 at 1 (detailing "Duty of Loyalty")). This satisfies the second factor. See, e.g., Burger King, 471 U.S. at 479 (finding exercise of jurisdiction comported with due process where "this franchise

_____

11 "A court . . . may exercise pendent personal jurisdiction over any claim that arises out of a common nucleus of operative facts as the claim over which the court has personal jurisdiction." Pan-American, 825 F. Supp. 2d at 678 (internal quotation marks omitted). Here, Plaintiffs' claims against Darrell Sparks all derive from his alleged involvement in the transmission of information from Integrity's Encompass System and the resulting loss of client relationships (see, e.g., Docket Entry 63 at 2 (detailing Plaintiffs' statement of the case)), and thus their tort claims against Darrell Sparks arise from "a common nucleus of operative facts," Pan-American, 825 F. Supp. 2d at 678, with their breach of contract claim. Accordingly, the Court need not separately analyze the existence of jurisdiction for Plaintiffs' tort claims against Darrell Sparks. See North Carolina Mut. Life Ins. Co. v. McKinley Fin. Serv., Inc., 386 F. Supp. 2d 648, 656 (M.D.N.C. 2005) (exercising jurisdiction over two additional claims even though the "[third-party plaintiff] made no argument as to [the third-party defendant's] personal jurisdiction with relation to any other claim than to tortious interference with contract," explaining that it found that such claims "arise[] within the same common nucleus of operative fact").

dispute grew directly out of 'a contract which had a *substantial* connection with that State'" (emphasis in original)).

That leaves only a final examination of whether exercise of personal jurisdiction remains constitutionally reasonable.  See Carefirst, 334 F.3d at 397.  This element "ensures that litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent. The burden on the defendant, interests of the forum state, and the plaintiff's interest in obtaining relief guide [the Court's] inquiry."  Tire Eng'g, 682 F.3d at 303 (citation and internal quotation marks omitted).

The exercise of personal jurisdiction over Darrell Sparks qualifies as constitutionally reasonable.  To begin, and notably, Darrell Sparks does not contend that litigating this matter in North Carolina will impose any burden on him, let alone a constitutionally unreasonable one.  (See Docket Entries 70, 70-1, 83.)  Moreover, any generalized concern about the inconvenience or cost of litigating in North Carolina rather than Kentucky would not defeat jurisdiction.  See Burger King, 471 U.S. at 477 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.").  In this regard, the United States Supreme Court long ago concluded that, "because

modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity, it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." Id. at 474 (internal quotation marks omitted).

Put simply, "[a]lthough defending a lawsuit in North Carolina [i]s, without doubt, inconvenient for [Darrell Sparks], the inconvenience [i]s not so grave as to offend constitutional due process principles." Christian Sci., 259 F.3d at 217; see also Consulting Eng'rs, 561 F.3d at 278 ("[B]ecause [the defendant's] activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." (brackets in original) (quoting Burger King, 471 U.S. at 476)). This appears particularly true here given that the same counsel represents both Rodgers, Milligan, and Prime (collectively, the "Rodgers Defendants") as well as Darrell Sparks (see Docket Entry 10 at 1), enabling him to "join in and fully adopt the arguments and legal authority set forth [in Rodgers Defendants' briefing]" (Docket Entry 70 at 19; see also Docket Entry 83 at 11 (same)) in support of his own motions, thereby reducing the cost, burden, and inconvenience of litigation.

Finally, North Carolina surely possesses an interest in assuring redress for its injured resident corporation, especially regarding the breach of an agreement that contains North Carolina choice-of-law, forum-selection, and consent-to-jurisdiction provisions. See Burger King, 471 U.S. at 482-83 (concluding that a state has a "'legitimate interest in holding [the defendant] answerable on a claim related to' the contacts he had established in that State"). Simply put, "exercise of specific personal jurisdiction over [Darrell Sparks] is consistent with traditional notions of fair play and substantial justice." Christian Sci., 259 F.3d at 218 (internal quotation marks omitted).

In short, Plaintiffs have made a sufficient showing that personal jurisdiction over Darrell Sparks exists. Therefore, the Court should deny his Rule 12(b)(2) dismissal request.

**B. Rule 12(b)(6) Challenge**

In light of the foregoing, the analysis turns to Darrell Sparks's Rule 12(b)(6) challenges. As noted above, Darrell Sparks seeks dismissal of Plaintiffs' breach of fiduciary duty claim, tortious interference claim, and CFAA claim (see Docket Entry 69 at 2), and Plaintiffs consent to the dismissal of their CFAA claim (see Docket Entry 87 at 5). However, Plaintiffs oppose the request to dismiss the breach of fiduciary duty and tortious interference claims. (See id. at 4-6.) In Plaintiffs' view, they allege sufficient facts "to establish a fiduciary duty and duty of

loyalty" (id. at 4) and properly state a claim for tortious interference (see id. at 5). Plaintiffs' arguments lack merit.

### i. Relevant Standards

In reviewing a Rule 12(b)(6) motion, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." Coleman v. Maryland Ct. of App., 626 F.3d 187, 189 (4th Cir. 2010), aff'd sub nom., Coleman v. Court of App. of Md., 566 U.S. 30 (2012). The Court must also "draw all reasonable inferences in favor of the plaintiff." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted). It "do[es] not, however, accept as true a legal conclusion couched as a factual allegation" nor does it "accept unwarranted inferences, unreasonable conclusions, or arguments." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015), as amended on reh'g in part (Oct. 29, 2015) (internal quotation marks omitted). It "can further put aside any naked assertions devoid of further factual enhancement." Id. (internal quotation marks omitted).

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's

liability for the alleged misconduct. Id. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 679).

### ii. Analysis

As an initial matter, to the extent that Plaintiffs seek to assert a claim for breach of the duty of loyalty distinct from their breach of fiduciary duty claim (see Docket Entry 63, ¶ 79; Docket Entry 87 at 4, 5), such efforts fail. North Carolina does not "recogniz[e] an independent tort claim for a breach of duty of loyalty." Dalton v. Camp, 353 N.C. 647, 653, 548 S.E.2d 704, 709

(2001).[12] Further, to the extent that "[t]he Sparks[es]' employment contracts require them to be loyal" (Docket Entry 87 at 5), the Second Amended Complaint already contains a breach of contract claim for the asserted breach of the Sparkses' "contractual and employment agreements with Integrity that required them to work only for Integrity and to be loyal to Integrity alone" (Docket Entry 63, ¶ 71). (See id., ¶¶ 70-73.) Accordingly, Plaintiffs cannot pursue an independent claim for breach of the duty of loyalty.

Additionally, as a general matter, North Carolina does not recognize the existence of a fiduciary relationship in the employee-employer context. See Dalton, 353 N.C. at 651-52, 548 S.E.2d at 707-08. Only when an employer reposes such confidence in an employee that the employee exercises domination and influence over the employer can a fiduciary relationship form. See id. at 651, 548 S.E.2d at 707-08. In other words, in the absence of "a legal relationship which imposes a *de jure* fiduciary relationship," Lockerman v. South River Elec. Membership Corp., 794 S.E.2d 346, 351 (N.C. Ct. App. 2016), "[o]nly when one party figuratively holds all the cards — all the financial power or technical information, for example — have North Carolina courts found that the special

_____

12 The parties treat Plaintiffs' state-law claims as arising under North Carolina law. (See Docket Entries 68, 70, 72, 77, 80, 82, 83, 86, 87 (relying on North Carolina law for state-law claims).)

circumstance of a fiduciary relationship has arisen," <u>id.</u> at 352

(internal quotation marks omitted).

The "loan officer . . . duties and responsibilities" that

Plaintiffs identify for Darrell Sparks do not reflect such

circumstances. (<u>See</u> Docket Entry 63, ¶ 75.) Nor does the mere

allegation that Darrell Sparks served as "the branch manager" (<u>id.</u>,

¶ 25) of "an Integrity office in Kentucky" (<u>id.</u>, ¶ 24) suffice,

particularly given the allegation that "Integrity is based in . . .

North Carolina, with branches across the United States" (<u>id.</u>,

¶ 18). As the North Carolina Supreme Court has explained:

> In applying this Court's definition of fiduciary
> relationship to the facts and circumstances of the
> instant case — in which employee [defendant] served as
> production manager for a division of employer
> [plaintiff's] publishing business — we note the
> following: (1) the managerial duties of [the defendant]
> were such that a certain level of confidence was reposed
> in him by [the plaintiff]; and (2) as a confidant of his
> employer, [the defendant] was therefore bound to act in
> good faith and with due regard to the interests of [the
> employer]. In our view, such circumstances, as shown
> here, merely serve to define the nature of virtually all
> employer-employee relationships; without more, they are
> inadequate to establish [the defendant's] obligations as
> fiduciary in nature. No evidence suggests that his
> position in the workplace resulted in "domination and
> influence on the [plaintiff]," an essential component of
> any fiduciary relationship. [The defendant] was hired as
> an at-will employee to manage the production of a
> publication. His duties were those delegated to him by
> his employer, such as overseeing the business's
> day-to-day operations by ordering parts and supplies,
> operating within budgetary constraints, and meeting
> production deadlines. In sum, his responsibilities were
> not unlike those of employees in other businesses and can
> hardly be construed as uniquely positioning him to
> exercise dominion over [the plaintiff]. Thus, absent a
> finding that the employer in the instant case was somehow

> subjugated to the improper influences or domination of
> his employee — an unlikely scenario as a general
> proposition and one not evidenced by these facts in
> particular — we cannot conclude that a fiduciary
> relationship existed between the two.

Dalton, 353 N.C. at 651-52, 548 S.E.2d at 708 (citation omitted).
Given the absence of factual allegations reflecting Darrell
Sparks's domination and influence over Integrity, the Court should
dismiss Plaintiffs' breach of fiduciary duty claim against him.

Finally, adopting the arguments in support of the Rodgers
Motion (see Docket Entry 70 at 18, 19; Docket Entry 83 at 11),
Darrell Sparks moves to dismiss Plaintiffs' tortious interference
claim. Although framed as one claim (see Docket Entry 63 at 10
("Count IV - Common Law Tortious Interference")), Plaintiffs'
tortious interference claim actually asserts two distinct causes of
action: "one for tortious interference with current business
relations and one for tortious interference with prospective
business relations," Superior Performers, Inc. v. Phelps, 154 F.
Supp. 3d 237, 248 (M.D.N.C. 2016). (See, e.g., Docket Entry 63,
¶ 59.) Notwithstanding sometimes imprecise language, "under North
Carolina law, claims for tortious interference with business
relations and prospective business relations are understood to be
claims for tortious interference with contract and prospective
contract, respectively." Superior Performers, 154 F. Supp. 3d at
248.

As to the former,

> [t]he tort of interference with contract has five elements: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

United Labs., Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

Coordinately,

> [t]o state a claim for tortious interference with prospective business relations, a plaintiff "must allege facts to show that the defendants acted without justification in 'inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference'" and that the defendants' conduct proximately caused "measurable damages[.]" Walker v. Sloan, 137 N.C. App. 387, 393, 394, 529 S.E.2d 236, 242 (2000) (quoting Cameron v. New Hanover Mem'l Hosp., 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982)). A plaintiff "must allege actual loss" of a "prospective contractual relationship, . . . a fundamental element of a tortious interference claim." AECOM Tech. Corp. v. Keating, No. [11cvs9225,] 2012 WL 370296, at *5 (N.C. Special Super. Ct. Feb. 6, 2012) (unpublished) (citing Dalton[, 353 N.C. at 654, 548 S.E.2d at 709-10]); see also DaimlerChrysler Corp. v. Kirkhart, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002) (finding that the plaintiff failed to establish a likelihood of success on the merits of its tortious interference with prospective advantage claim when it "failed to identify any particular contract that a third party has been induced to refrain from entering into" with the plaintiff). It is not enough to allege that the plaintiff had "an expectation of a continuing business relationship" with a third party. Dalton, 353 N.C. at 655, 548 S.E.2d at 710; see also Sports Quest, Inc.[ v. Dale Earnhardt, Inc., Nos. 02cvs140, 01cvs2200], 2004 WL 742918, at *5 [(N.C. Special Super. Ct. Mar. 12, 2004)] (stating that the plaintiff's "expectation of future contracts with current customers" is insufficient).

<u>Superior Performers</u>, 154 F. Supp. 3d at 249 (ellipsis and second set of brackets in original).

Viewed in the light most favorable to Plaintiffs, the Second Amended Complaint offers the following <u>factual</u> allegations[13] in support of Plaintiffs' combined tortious interference claims:

Certain Defendants "export[ed] loans from Integrity's Encompass System and import[ed] them into the Prime Encompass System" (Docket Entry 63, ¶ 25), with a goal of "transition[ing] the entire Integrity branch to Prime" (<u>id.</u>, ¶ 26). "Several loans that were initially Integrity's closed at Prime, the number which will be determined at trial." (<u>Id.</u>, ¶ 28.) "A client who is using or considering using Integrity's services provides Integrity with a wide variety of personal confidential information" (<u>id.</u>, ¶ 30), and, "[i]f a competitor obtained this information, as Prime did, it could and did undercut Integrity on Integrity's loans and divert Integrity's clients by aggressively pursuing those clients based on the information kept by Integrity" (<u>id.</u>, ¶ 31). "The loss of business . . . is and was substantial." (<u>Id.</u>, ¶ 32.) "Plaintiffs

_____

13    Plaintiffs also allege, without factual development, various elements of these torts. (<u>See, e.g.</u>, Docket Entry 63, ¶¶ 63 ("But for Defendants' actions, the borrowers would have entered into future contracts with Plaintiffs."), 66 ("Through their actions, Defendants induced and/or caused a termination of these relationships or expected relationships.").) However, the Court may "discount such unadorned conclusory allegations" in ruling on a Rule 12(b)(6) motion. <u>Francis</u>, 588 F.3d at 193 (explaining "that naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief" (internal quotation marks omitted)).

enjoy existing business relationships with borrowers as well as the expectancy of business relationships with potential borrowers who indicate an interest in engaging Plaintiffs' services." (Id., ¶ 59.) "More specifically, Integrity had contracts with at least the following borrowers: [thirteen named individuals]." (Id., ¶ 60.) "Defendants intentionally interfered with these existing and prospective relationships by diverting borrowers to Prime, in many cases, on information and belief, without the borrowers' knowledge that this was occurring." (Id., ¶ 65.)

These allegations fail to plausibly allege either kind of tortious interference claim. Both versions of this claim require that a defendant induce a third party to either not form or honor, as appropriate, a contract with the plaintiff. See Superior Performers, 154 F. Supp. 3d at 248-49. Even assuming that the Second Amended Complaint sufficiently identifies the alleged contracts at issue, it lacks the necessary "factual enhancement," Francis, 588 F.3d at 193 (internal quotation marks omitted), regarding Defendants' actions vis-à-vis the relevant third parties.

In other words, Plaintiffs pin their tortious interference claims on certain Defendants' alleged exporting of Integrity's loans to Prime's system (see Docket Entry 63, ¶¶ 24-27; see also Docket Entry 86 at 1-4) and the fact that "[s]everal loans that were initially Integrity's closed at Prime" (Docket Entry 63, ¶ 28). However, the Second Amended Complaint also asserts that

this "diverting borrowers to Prime, in many cases . . ., [happened] without the borrowers' knowledge that this was occurring" (id., ¶ 65 (emphasis added)) and it contains no factual assertions regarding Defendants' interactions with the relevant borrowers that induced such borrowers to cease honoring their existing contracts or entering into new contracts with Plaintiffs (see generally Docket Entry 63).  The absence of any factual assertions regarding Defendants' inducement of relevant borrowers dooms Plaintiffs' tortious interference claim.  See Dalton, 353 N.C. at 655, 548 S.E.2d at 710 (explaining that two obstacles undermine the plaintiff's tortious interference claim, including that "there is no evidence suggesting that [the defendant] induced, no less maliciously induced, [the third party] into entering a contract," and concluding that, "[t]he absence of evidence supporting two essential elements of a party's allegation of interference with prospective advantage — intervenor's inducement of a third party and a showing that a contract would have ensued — exposes a fatal weakness in that claim").

In sum, Plaintiffs fail to plausibly allege that Defendants tortiously interfered with Plaintiffs' contracts or prospective contracts.  Accordingly, the Court should also grant Darrell Sparks's request to dismiss this claim.

## II. Rodgers Motion

Rodgers Defendants also seek Rule 12(b)(6) dismissal of certain of Plaintiffs' claims. In particular, Rodgers Defendants move to dismiss Plaintiffs' tortious interference claim, their "defamation claim against Rodgers" (Docket Entry 67, ¶ 2), and their CFAA claim. (See id., ¶¶ 1-3.) Plaintiffs consent to the dismissal of their defamation claim and their CFAA claim. (See Docket Entry 86 at 4; see also id. at 2 n.1; Docket Entry 81 at 2.) Moreover, for the reasons stated above, Plaintiffs' tortious interference claim falls short under Rule 12(b)(6). Accordingly, the Court should grant the Rodgers Motion and dismiss Plaintiffs' defamation claim against Rodgers and their tortious interference and CFAA claims against all Rodgers Defendants.

## III. Eli Motion

Eli Defendants similarly seek Rule 12(b)(6) dismissal of all claims against them. (See Docket Entry 71 at 1.) According to Eli Defendants, they

> have been named in the lawsuit for no other reason than their alleged direct and indirect ownership interest in Defendant Prime. Plaintiffs do not make **a single factual allegation** to support any claim or theory of liability against [Eli] Defendants, but instead make only conclusory assertions, and even then, only "on information and belief."

(Docket Entry 72 at 3 (emphasis in original) (citation omitted).)

In response, Plaintiffs maintain that the Second Amended Complaint "properly alleges [Eli] Defendants' indirect liability."

41

(Docket Entry 77 at 2.)  More specifically, Plaintiffs contend (in full) that:

> [t]he Second Amended Complaint contains a number of specific allegations regarding [Eli] Defendants' conduct, including that:
>
> - "[T]he Corporate Defendants[14] collectively exercise actual control over Prime and Rodgers, and by virtue of that control, exercise control over the other Defendants." ([Docket Entry 63], ¶ 23).
>
> - "[T]he Corporate Defendants actively participated in and encouraged the activities alleged herein." ([Id.], ¶ 23).
>
> - "The Corporate Defendants are the alter-ego of the other defendants and discovery in this case will show that this is the case and that the Corporate Defendants controlled and control Prime, Rodgers, and the other defendants." ([Id.], ¶ 23).
>
> - "The Sparks[es], with the active participation and instruction of the other Defendants, including the Corporate Defendants and Rodgers and Prime, without authorization, and/or exceeding authorization, far exceeded the scope of their allowed access and intentionally accessed Integrity's Encompass System, which is a protected computer, knowingly causing the transmission of certain information." ([Id.], ¶ 90).
>
> [Eli] Defendants do not directly address these new allegations and instead attempt to dismiss them wholesale as merely "one paragraph of legal conclusions." Instead, the Second Amended Complaint alleges, at the very least, that [Eli] Defendants (1) "collectively exercise actual control over Prime and Rodgers," (2) "actively participated in and encouraged the activities alleged herein," and (3) "are the alter-ego of the other

---

14    It bears emphasis that the Second Amended Complaint defines "Corporate Defendants" to include Prime in addition to Eli Defendants.  (<u>See</u> Docket Entry 63 at 1.)

defendants." The Second Amended Complaint also alleges
that (4) the Sparks[es]' improper computer access was
done "with the active participation and instruction" of
[Eli] Defendants. Accordingly, Plaintiffs have
sufficiently alleged [Eli] Defendants' indirect
liability.

(Docket Entry 77 at 2 (bullets and certain sets of brackets in
original).)

As Plaintiffs' opposition makes clear, they offer only naked
allegations of wrongdoing and legal conclusions fashioned as
factual assertions against Eli Defendants. See, e.g., SD3, LLC,
801 F.3d at 423 ("[The plaintiff] nakedly alleges only that all of
the corporate subsidiaries are 'dominated by, and [are] alter
ego[s] of,' these corporate parents. That allegation offers only
a legal conclusion, and [the plaintiff] has alleged *no facts*
suggesting the kind of unity of interests that we usually require
a party to plead before permitting them to advance an alter ego
theory." (emphasis and second and third sets of brackets in
original) (citation omitted)). As the Fourth Circuit has noted,
"[u]nadorned conclusory allegations like the[ ones Plaintiffs offer
here] are akin to no allegations at all." Id. (internal quotation
marks omitted). Accordingly, because "naked assertions of
wrongdoing necessitate some factual enhancement within the
complaint to cross the line between possibility and plausibility of
entitlement to relief," Francis, 588 F.3d at 193 (internal
quotation marks omitted), and the Second Amended Complaint lacks
such factual enhancement as to Eli Defendants (see generally Docket

43

Entry 63), Plaintiffs' claims against Eli Defendants cannot survive Rule 12(b)(6) scrutiny.

Therefore, the Court should grant the Eli Motion and dismiss all claims against Eli Defendants.

## IV. Counterclaim Motion

As a final matter, Counterclaim Defendants seek dismissal of counterclaims related to certain "Monthly Incentive Bonus payments" that Mathosian allegedly misappropriated from Prime during his employment (Docket Entry 73 at 17, ¶ 30). (See Docket Entry 85 at 1 n.1; see generally Docket Entry 76.) More specifically, Counterclaim Defendants seek dismissal of the conversion counterclaim (Count VI) and the equitable restitution based on unjust enrichment counterclaim related to bonus payments from 2012 through 2016 (Count VIII). (See Docket Entry 85 at 1 n.1; see also Docket Entry 73 at 31, 33.) However, Counterclaim Defendants' dismissal requests lack merit.

As a preliminary matter, in requesting dismissal of these counterclaims, Counterclaim Defendants failed to comply with this Court's Local Rules. In particular, Local Rule 7.3(a) specifies that "[e]ach motion shall be set out in a separate pleading" and, subject to some exceptions not relevant here, "shall be accompanied by a brief." M.D.N.C. LR 7.3(a). The Counterclaim Motion fails to satisfy these requirements. (See, e.g., Docket Entry 76 at 1 ("Motion to Dismiss Counterclaim Counts VI, VII and VIII and

Incorporated Memorandum of Law").)[15]  This failure alone justifies

its denial.  See M.D.N.C. LR 83.4(a).

In addition, Counterclaim Defendants' arguments fail to

justify Rule 12(b)(6) dismissal.  In regard to the conversion

counterclaim, Counterclaim Defendants contend that "Prime has not

alleged demand or refusal, wrongful taking or disposal and, as a

result, Prime has failed to state a claim for conversion." (Docket

Entry 76 at 3.)  However, the Counterclaims allege that, inter

alia:

> 28. During each month of his employment with Prime,
> Mathosian calculated his Monthly Incentive Bonus and
> notified Prime of the amount he was owed.  Each month,
> Prime paid Mathosian the Monthly Incentive Bonus that
> Mathosian represented to Prime he was owed under the
> terms of his Employment Agreement.
>
> 29. On several occasions over the course of Mathosian's
> four-year employment with Prime, Mathosian intentionally
> misrepresented the Monthly Incentive Bonus amount that he
> was owed, causing Prime to overpay Mathosian on multiple
> occasions.
>
> 30. Through this scheme, over the course of Mathosian's
> employment at Prime, Mathosian misappropriated over
> $14,000 from Prime in Monthly Incentive Bonus payments.

(Docket Entry 73 at 17.)

As such, the Counterclaims sufficiently plead Mathosian's

"wrongful taking" of the allegedly misappropriated payments.  See,

e.g., White v. Consolidated Planning, Inc., 166 N.C. App. 283, 311,

---

15  Although styled as seeking dismissal of Count VII, "the
substance of [the Counterclaim] Motion only addressed Counts VI and
VIII.  Accordingly, [Counterclaim Defendants] . . . are not seeking
dismissal of Count VII."  (Docket Entry 85 at 1 n.1.)

603 S.E.2d 147, 165–66 (2004) ("Here, [the misappropriating individual] did not rightfully come into personal possession of plaintiff's funds; the 'wrongful taking' and [said individual's] possession of the funds were simultaneous. The conversion occurred when [this individual] exercised unlawful dominion over the funds . . . .").[16] Further, "[i]n the case of a conversion by wrongful taking it is not necessary to prove a demand and refusal. So the wrongful assumption of the property and right of disposing of goods may be a *conversion in itself*, and render a demand and refusal unnecessary." Trustees of Univ. of N.C. v. State Nat'l Bank, 96 N.C. 280, 3 S.E. 359, 361 (1887) (emphasis in original) (internal quotation marks omitted). Accordingly, Counterclaim Defendants' arguments fail to justify dismissal of the conversion counterclaim.[17]

_____

16 Counterclaim Defendants attempt to distinguish White on the grounds that the misappropriation there occurred without the plaintiffs' knowledge or permission. (Docket Entry 85 at 2, 3.) In Counterclaim Defendants' view, "[a]s Prime paid Mathosian voluntarily, there is no question that such payments were with its permission. Thus, Prime cannot escape its allegations of voluntary payment by tacking on a naked allegation that such payments amounted to a 'wrongful taking.'" (Id. at 3.) This argument misses the mark. To begin, the Counterclaims contain more than a "naked allegation" of wrongful taking. (See, e.g., Docket Entry 73 at 17, ¶¶ 28–30.) Moreover, according to the Counterclaims, Prime voluntarily (i.e., knowingly) paid Mathosian the amount it believed (per his representation) that it owed him; it did not voluntarily (over)pay him the amount owed plus an extra $14,000.

17 In their reply, Counterclaim Defendants raise for the first time an argument concerning Prime's alleged "fail[ure] to identify or describe the specific funds that were allegedly converted." (Docket Entry 85 at 3.) However, "[t]he ordinary rule
(continued...)

Counterclaim Defendants further seek dismissal of the second equitable restitution counterclaim (Count VIII) because it purportedly fails to plead in the alternative that Mathosian's "employment contract is invalid." (Docket Entry 85 at 3, 4; <u>see also</u> Docket Entry 76 at 3.) In making this argument, Counterclaim Defendants maintain that, "[u]nlike Count VII, where Prime alleges, in the alternative, 'to the extent Mathosian's Employment Agreement is not valid and enforceable,' there is no such language in Count VIII." (Docket Entry 85 at 4.) However, as the first paragraph in Count VIII, "Prime repeats and realleges the allegations set forth in Paragraphs 1 through 138 of its Counterclaim as if fully set forth herein." (Docket Entry 73 at 33, ¶ 139.) Accordingly, Count VIII incorporates by reference the allegations in Count VII that, "[a]lternatively to Counts I and III, to the extent Mathosian's Employment Agreement is not valid or enforceable, Prime seeks

_____

17(...continued)
in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." <u>Clawson v. FedEx Ground Package Sys., Inc.</u>, 451 F. Supp. 2d 731, 734 (D. Md. 2006); <u>see also</u> <u>Hunt v. Nuth</u>, 57 F.3d 1327, 1338 (4th Cir. 1995) (explaining that "courts generally will not address new arguments raised in a reply brief because it would be unfair to the [other party] and would risk an improvident or ill-advised opinion on the legal issues raised"); <u>HSK v. Provident Life & Accident Ins. Co.</u>, 128 F. Supp. 3d 874, 884 (D. Md. 2015) ("To the extent [the plaintiff] suggests that [the defendant's] non-compliance with the settlement agreement is an independent basis for liability, that argument is procedurally improper. By waiting to raise it until his reply brief, [the plaintiff] deprived [the defendant] of an opportunity to respond, and deprived this court of the benefit of any such response."). As such, the Court should decline to consider Counterclaim Defendants' identification contention in ruling on the Counterclaim Motion.

equitable restitution . . ." (id. at 32, ¶ 130) and that, "[t]o the extent Mathosian does not have a valid and enforceable Employment Agreement with Prime, Prime has conferred upon Mathosian a benefit which was not required by contract or legal duty" (id. at 33, ¶ 134). Thus, because Count VIII pleads in the alternative the invalidity of Mathosian's employment agreement, Counterclaim Defendants' dismissal arguments fall short.

In sum, Counterclaim Defendants have not shown grounds for dismissal of the conversion and second equitable restitution counterclaims. The Court should therefore deny the Counterclaim Motion.

## CONCLUSION

The Court lacks jurisdiction over Jared and Tina Sparks, but Plaintiffs have made a prima facie showing that jurisdiction exists over Darrell Sparks. Nevertheless, Plaintiffs have not plausibly alleged breach of fiduciary duty or tortious interference claims against Darrell Sparks or Rodgers Defendants. Plaintiffs further failed to plausibly allege any claims against Eli Defendants. In addition, Plaintiffs have consented to dismissal of their CFAA and defamation claims against Darrell Sparks and Rodgers Defendants. Finally, Counterclaim Defendants' challenge to the conversion and second equitable restitution counterclaims lack merit.

**IT IS THEREFORE RECOMMENDED** that the Sparks Motion (Docket Entry 69) be granted in part and denied in part as follows: all

claims against Jared Sparks and Tina Sparks be dismissed for lack of personal jurisdiction and Plaintiffs' breach of fiduciary duty, CFAA, and tortious interference claims be dismissed against Darrell Sparks.

**IT IS FURTHER RECOMMENDED** that the Rodgers Motion (Docket Entry 67) and the Eli Motion (Docket Entry 71) be granted.

**IT IS FURTHER RECOMMENDED** that the Counterclaim Motion (Docket Entry 76) be denied.

This 15th day of January, 2019.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**